## RYMER et al. v. ANCHOR STOVE & RANGE CO.

## ANCHOR STOVE & RANGE CO. v. RYMER et al.

### Nos. 6381, 6382.

Circuit Court of Appeals, Sixth Circuit.
April 13, 1934.

Burnet Sizer, of Chattanooga, Tenn. (Chas. S. Mayfield and Mayfield & Mayfield, all of Cleveland, Tenn., and Sizer, Chambliss & Kefauver, of Chattanooga, Tenn., on the brief), for Rymer and others.

Walter F. Murray, of Cincinnati, Ohio (Murray & Zugelter, of Cincinnati, Ohio, and Miller, Miller & Martin, of Chattanooga, Tenn., on the brief), for Anchor Stove & Range Co.

Before HICKS and SIMONS, Circuit Judges, and WEST, District Judge.

SIMONS, Circuit Judge.

A bill in equity was filed in the cause below by the appellee as plaintiff charging the appellants with the sale of cabinet heaters in unfair competition with the plaintiff's product. From a decree granting the plaintiff limited injunctive relief, and reference

to a master to assess damages, both parties have appealed; the defendants contending that no relief should have been granted, and that in any event the plaintiff was not entitled to damages; and the plaintiff's grievance being that neither the injunction nor the accounting was broad enough to protect it from future injury, and compensate it for losses sustained.

The case involves a product of the class described by this court in Estate Stove Company v. Gray & Dudley Company, 41 F.(2d) 462, 464, and is in many respects factually parallel with it. The plaintiff had been a manufacturer of stoves since 1865, and in 1925 began the manufacture and sale of cabinet heaters; its plan for establishing trade being to grant to retail dealers in such cabinets in the medium size and larger cities of Illinois, Indiana, Ohio, Kentucky, Tennessee, Virginia, West Virginia, and North Carolina, an exclusive agency. In 1927 it brought out its "Tudor" heater, the characteristic feature of which was its simplicity and absence of ornamentation, in which respect it differed from most of the other cabinets on the market. During 1927 it spent upwards of $5,000 in advertising, distributed 100,000 circulars to retail dealers, and manufactured and sold upwards of 1,600 heaters.

In 1928 the defendants took into their employ a former salesman for the plaintiff, and shortly thereafter put upon the market a heater of substantially identical design, which it called "The Dixola" No. 520. Before this heater was ready for the market orders were taken thereon from photographs, and while it is not exactly clear, there is room for the inference that the photographs were pictures of the plaintiff's Tudor cabinet. The heaters sold by the defendants to retail dealers and the general public had attached to them a plate giving the name of the heater, their own names as manufacturers, and the place where the heaters were made.

Early in 1928, however, the defendants entered into a contract to make cabinet heaters for the large mail order house of Montgomery Ward & Co., of Chicago. It is not disputed that the design for the cabinet to be manufactured for Montgomery Ward was the design of the plaintiff's Tudor, selected by the agent of the mail order house from a number of cabinet heaters on display in the defendants' factory. In pursuance of its general sales policy, Montgomery Ward did not permit the defendants to put their own name plate upon the heater, but required a plate to be put upon the inside of the outer casing bearing the inscription "Montgomery Ward & Co., Chicago, Illinois. Dictator-Windsor."

The heater made for Montgomery Ward was sold by it and advertised in its catalogue at a much lower price than the plaintiff's Tudor. Not long after the Montgomery Ward 1928-1929 catalogue appeared the plaintiff began receiving complaints from retail dealers throughout the territory, together with cancellation of orders. These complaints almost invariably referred to the photographs and descriptions in the Montgomery Ward catalogue, charged that the heater there described and depicted was the plaintiff's Tudor, that the plaintiff was guilty of bad faith in underselling its own dealers, and had breached its exclusive agency contract with them.

In 1928 the plaintiff's sales fell from 1,600 to between 900 and 1,000 heaters, and this notwithstanding the earnest efforts of the plaintiff to convince its dealers that the Montgomery Ward heater was not of its manufacture. Anxious to avoid the competition thus resulting, and to relieve itself of the charges of bad faith and of what one witness called the "storm of protest" that followed the appearance on the market of the Montgomery Ward cabinet, the plaintiff determined to change its design, and late in the summer of 1928 brought out a new heater called "The Sunshine," and issued circulars illustrating and describing it to its retail customers. In January, 1929, however, it began to receive complaints that the defendants were offering a heater similar to the Sunshine. This heater was put out by the defendant as "Dixola 640," and while it is not as slavish a copy of the Sunshine as its earlier heater was of the Tudor, it evidently possessed enough identical features to cause confusion in the minds of the plaintiff's customers and their prospects, and was sold in part of the territory by another of plaintiff's former salesmen. Dixola 640 had upon it a name plate indicating its origin, and it was not sold through Montgomery Ward or any other mail order house, but directly to dealers.

The principles to be applied in determining whether a property right exists to the exclusion of the public in a mere trade dress or design, as distinguished from a trademark or a design protected by patent, have been fully considered by this court. Globe-Wernicke Company v. Fred Macey Co., 119 F. 696; Merriam Co. v. Saalfield Pub. Co., 238 F. 1; Upjohn Co. v. Merrell Chemical Co., 269 F. 209, 211; Moline Pressed Steel

Company v. Dayton Toy & Specialty Company, 30 F.(2d) 16; Estate Stove Company v. Gray & Dudley Company, supra. See, also, Chesebrough v. Old Gold Chemical Company (C. C. A.) 70 F.(2d) 383, this day announced. It is unnecessary to again trace the origin and development of the principles in the above cases discussed. It is sufficient to say generally, as was said in the Upjohn Company Case, that "where the imitation relates only to matters as to which the defendant has, prima facie, a right equal to plaintiff, there must have been a public acquiescence in plaintiff's appropriation of these things (size, shape and color) for his product—a public sanction of the taking—sufficient to have created that secondary meaning whereby they have become, to the public, indicia of origin," and "as to those means of identification, which are descriptive, or which, for any reason, are known and open to all, there is no basis, in principle or in authority, for the creating of a title or quasi exclusive right in plaintiff, except the theory that there has been this public sanction of plaintiff's appropriation, by acquiescence which has continued long enough and under circumstances suitable to raise a presumption that the public concedes the right and to make it inequitable thereafter to dispute it."

In the Upjohn Case, the test applied to determine whether the particular form of wafer produced by the plaintiff therein had acquired a secondary meaning was the reaction to it of the general public, the wafers having been sold in sufficiently identified packages to avoid deception of the retail druggist, and so while advertising had been extensive and sales to druggists large, since the wafers had not been upon the market a sufficient length of time for the consuming public to come to the belief that all wafers of this appearance were "Phenolax," and since short of such rather general belief the plaintiff could have no quasi exclusive right which was then infringed by the defendant, relief was denied. It was said, however, that each case depends so absolutely upon its own circumstances, that a controlling precedent is not to be expected.

We have here a somewhat unusual situation. While the retail dealers were not, when ordering, deceived because their purchases were made directly from the plaintiff, and the defendants' cabinets were sufficiently distinguishable by their inner construction and the name plate indicating their source, and while there is no proof that the general public actually purchased cabinets from Montgomery Ward thinking that they were the cabinets of the plaintiff, yet the confusion on the part of the dealers resulting from the cuts and descriptions in the mail order catalogue as to the source of the Montgomery Ward heater, the confusion on the part of prospective customers who had seen the plaintiff's cabinet on the floor of the dealers, and who had also seen the pictures and descriptive matter put forth by Montgomery Ward, is well established by the record. And equally well established is the injury to the plaintiff from a confusion which brought about the cancellation of orders in some instances, and in others necessitated a greater sales effort and expense in convincing retail dealers that there had been no breach of faith on its part. In the Estate Stove Company Case, it was the opinion of the court that household devices of this kind would not normally be sold because of the mere attractiveness of their outward dress, and that ordinarily those who purchased them would examine them internally and be curious about their operation. But sales from catalogue were not in that case involved, nor was the effect of mail order competition there considered.

In the Upjohn Case the existence of a secondary meaning to the plaintiff's trade dress was denied, though the case was considered a close one. In the Estate Stove Company Case the existence of a secondary meaning in the outward form of the plaintiff's cabinet was assumed to exist because of the plaintiff's extensive advertising and sales effort. While the advertising and other exploitation in the instant case were not as extensive as in the Estate Stove Company Case, nor cover so wide a field, we think that within the limited territory in which the plaintiff's cabinets were sold and advertised the confusion that clearly resulted from the Montgomery Ward advertising in that territory, both in the minds of the dealers and their prospects, sufficiently demonstrates that a secondary meaning had attached to the Tudor design as denoting the origin of the plaintiff's heater, and that we cannot upon this record find error in the court's conclusion that unfair competition resulted. The court was also right in its conclusion that where the accused cabinets were plainly marked as being the product of the defendants, no substantial deception could result under the doctrine approved in the Estate Stove Company Case, on the theory that where one maker adopts the external appearance of another's product, he gains absolution from liability when he himself furnishes "the antidote with the bane."

However, in the sales made to Montgomery Ward there were no identifying marks on the defendant's product to denote its origin. The explanation is that the maker's plate was omitted not with purpose to deceive, but to comply with the Montgomery Ward requirements, in pursuance of its universal sales policy. But this will not permit the defendants to escape liability. They were under no. obligation to sell to Montgomery Ward. Having assumed the plaintiff's trade dress deliberately, and therefore without doubt intending to profit by the plaintiff's good will, and having in respect to the heaters sold to Montgomery Ward dispensed with the distinguishing marks by which both confusion and liability therefor could be avoided, it put within the power of its customer an opportunity for invading the plaintiff's property right, and the maker has been generally held to responsibility for contributing to the unfair competition which in such cases results. Warner & Company v. Eli Lilly & Co., 265 U. S. 526, 44 S. Ct. 615, 68 L. Ed. 1161.

The decree below went no further than to enjoin the sale of the defendant's heaters resembling those of the plaintiff without distinguishing marks indicating their origin, and to grant an accounting and assessment of damages to the extent that they had been sold without such distinguishing marks. The precise extent and kind of relief in cases such as this must, in the first instance, be a matter for the discretion of the District Court. Crescent Tool Company v. Kilborn & Bishop Co., 247 F. 299 (C. C. A. 2). We cannot say upon this record that the relief granted was either an abuse of or an unwise exercise of such discretion. Whether in the case of mail order sales such as those to Montgomery Ward the antidote would be equal to the bane we are not obliged to say, and the plaintiff does not in this respect complain of the decree.

As to the imitation of the plaintiff's Sunshine heaters by Dixola 640, it may well be argued that the trade dress of this heater had not yet acquired such secondary meaning as to indicate its origin. Had this imitative effort of the defendant stood alone, there might indeed be doubt as to the validity of the decree, but where imitation of another's product follows not only a basic design which has acquired a secondary meaning, but follows rather closely and swiftly such variations as are made for the very purpose of escaping the unfair competition resulting, equity ought not be too zealous to draw nice distinctions between basic designs and subsequent modifications thereof, and in any event the decree does not compel any more specific indication of origin than the defendant without compulsion undertook to make.

As to the accounting and assessment of damages decreed below, we recognize equally with the court below the difficulty of submitting to the master the proofs upon which damages may be assessed. The difficulty is not, however, insurmountable. Certainly with respect to the orders actually cancelled and not reinstated upon explanation by the plaintiff to its dealers, there is a sufficiently adequate factual basis for measuring damages, though we do not mean by this to imply that the proofs should be limited to such cancellations.

The decree below is affirmed.