PECHEUR LOZENGE CO., Inc., v. NATIONAL CANDY CO., Inc.

No. 5918.

District Court, D. New Jersey.

Dec. 31, 1940.

732

Henry Plate, of Hoboken, N. J., and Morgan & Lockwood, of New York City, for plaintiff.

McDermott, Enright & Carpenter, and James D. Carpenter, Jr., all of Jersey City, N. J., for defendant.

WALKER, District Judge.

The facts are:

1. The plaintiff, Pecheur Lozenge Co., Inc. (hereinafter referred to as "Pecheur"), is and at all times hereinafter mentioned, was a corporation organized and existing under the laws of the state of New York and a citizen of said state.

2. The defendant, National Candy Company, Inc. (hereinafter referred to as "National"), is and at all times hereinafter mentioned, was a corporation organized and existing under the laws of the state of New Jersey and a citizen of said state.

3. The plaintiff has spent money and done many things to advertize its trademark and enhance the value of its good will, both are here sought to be protected and the value of each is in excess of $3,000.

4. The product of Pecheur since 1916, has been sugar wafers or candy wafers made to simulate coins, each with the diameter of a one cent piece, wrapped at first in waxed paper, later transparent glassine, and more recently, transparent cellulose to form what are known to the trade and to purchasers as candy "Rolls".[1] "Pay Roll" is the name that has continuously identified the product since it first appeared in the retail market.

5. From 1916 to 1934, the labels used to wrap the rolls had the words "Pay Roll" printed thereon in blue and the dollar sign in red. In 1934,[2] Label No. 4,[3] was conceived and executed with coins simulated thereon. Each simulated coin had a circumference in yellow, a circle of stars in yellow, numeral or numerals and dollar sign in red. The words Pay Roll and the other words thereon were in blue. Labels No. 5 and No. 6 followed, the change being circumference of each coin in red and circle of stars in blue. On March 14, 1936, Label No. 7,[4] came into use and with immaterial changes it continues in use as Label No. 8. The simulated coins each have a circumference in red, a background in yellow, the word or words, numeral or numerals and figure within the circumference in red. The words "Pay Roll" and the other words thereon are in blue, the dollar signs in red.

6. A duplicate of Label No. 7 is attached hereto and made part hereof.

---

[1] Selling at retail for one cent a package.

[2] Order No. 46703 of Nashua Gummed & Coated Paper Co.

[3] Label registered, United States Patent Office on December 17, 1935 as No. 46862.

[4] Label registered, United States Patent Office on July 21, 1936 as No. 47748.

7. National is successor to Putnam & Brooks, established in 1865, and it first started to make sugar wafers or candy wafers with the diameter of a one cent piece in simulation of coins in 1908, and they were sold loose, a certain number for one cent from 1908 to 1936. In February, 1936,[5] National began to package said wafers in the form of a candy roll,[6] and it has continued to make said package by wrapping the wafers in transparent glassine labels with coins simulated thereon. Each simulated coin has a circumference in red, a background of yellow and the words and figure within the circumference in red. The words "Cash Roll" and the other words thereon are in red.

8. A duplicate of said label is attached hereto and made part hereof:

Trade-mark infringement is a part of the broader law of unfair competition, and the law of unfair competition may be summed up in the statement, that no man may sell his goods as and for the goods of another.

What Pecheur ultimately seeks is the protection of its good will. Its immediate concern is the protection of the identifying symbols of that good will—Pecheur's trade-mark and dress of package. Good will in commerce has been aptly defined as "the friendliness which a consumer has toward a particular article, it is that friendliness which induces him to purchase a particular thing rather than another."[7]

The law recognizes and courts will protect a name or device which identifies an owner's commercial good will whether it be a trade-mark or distinctive dress of pack-

9. Pecheur first learned of "Cash Roll" on or about October 30, 1937, and eventually this action resulted, when after notice (Letter of November 3, 1937) National denied infringement and refused to change the dress of its package.

### Discussion.

This is an action for trade-mark infringement and unfair competition.

age made use of by him in the sale of his merchandise.

Pecheur, like National, is a manufacturer of candy. The type of candy here involved has been described as sugar wafers or candy wafers. Both plaintiff's wafers and defendant's wafers are substantially the same size, about the diameter of a cent, and they simulate coins. Each wraps its wafers in transparent glassine or cellulose and forms what are known to the trade and

---

[5] Order for labels (wrapper) placed with Milprint Products Corporation, February 18, 1936.

[6] Selling at retail for one cent a package.

[7] Edward S. Rogers "Good Will, Trademarks and Unfair Trading" page 128.

to purchasers as candy "rolls". This is a common method of merchandising candy of said type. The candy is inexpensive and usually sells at retail for one cent a package, and a large part of the consumer demand comes from children who make the purchases themselves.

Pecheur, in 1916, adopted as its trade-mark the words "Pay Roll" and with this name it has continuously identified its product. In 1934, to carry out the significance of the name, it adopted for its wrapper or label a design, wherein a number of coins were simulated.

National, in 1936, adopted the words "Cash Roll" as a trade-mark for its packages of the candy hereinbefore referred to, and to carry out the significance of the name, it designed a wrapper or label which included therein the simulation of a number of coins.

An examination of the label of Pecheur and the label of National shows the name of the manufacturer in small letters. When the labels are wrapped about the candy and stacked, as they undoubtedly are for retail sale, it must be difficult, if not almost impossible, to ascertain the name of the manufacturer without picking up the roll and deliberately searching therefor. However, the fact that the name does appear thereon cannot be relied upon, because the purchaser is seldom as familiar with the name of the manufacturer as with his mark.

■■ The defendant coming forward to meet the plaintiff's charges, contends that the word "pay" is a common term in general use and its meaning is known by the average person to refer to money; that such a word cannot be the subject of exclusive appropriation by any single person but must be left to the general use of the public, and that the word "cash" is in the same category. This means the defendant considers neither the word "pay" nor the word "cash" capable of exclusive appropriation and hence incapable of functioning as a trade-mark. Even if defend-

ant were to contend otherwise with respect to the word "cash" it is clear that the manner in which it used the word in its catalog and price lists from 1908 to 1936 was not a trade-mark use. The word "cash" as thus used was intended to be descriptive, to designate a certain type of lozenge made and sold in bulk. It was not physically applied or affixed to either the wafers or the containers in which they were sold. A trade-mark must be applied or affixed to the goods or the containers in which they are sold.[8]

If the word "pay" were used to describe money or, more accurately, compensation, then of course the word would be in the public domain. But here the word "pay" in the unitary expression "Pay Roll" is applied in a fanciful and arbitrary sense to a candy package. Such use can and does indicate the origin and ownership of plaintiff's product. For example, if the word Ivory were applied to an object carved or otherwise made from the tusk of an elephant, it would be purely descriptive of such article and incapable of exclusive appropriation. It could never, when so used, function as a trade-mark since it is the generic name of the thing itself. But the same word Ivory as applied to soap is fanciful and arbitrary and can and does function as a trade-mark—for soap. What has been said of "Ivory" and "Pay Roll" would apply with equal force to "Cash Roll".

"Courts under certain circumstances protect the use of words as trade-marks, even though they suggest the ingredients, qualities, or characteristics of the goods. The distinction is between words which are 'descriptive' and those which are merely 'suggestive.'"[9]

National, in an effort to destroy Pecheur's trade-mark "Pay Roll," would first break up the expression into its component parts "Pay" and "Roll" and then attack each separately. This may not be done. The marks must be considered in their entirety.[10]

---

8 Diederich v. W. Schneider Wholesale Wine & Liquor Co., 8 Cir., 195 F. 35, L.R.A.1915B, 889, appeal dismissed for want of jurisdiction, 232 U.S. 720, 34 S. Ct. 601, 58 L.Ed. 814; Schneider v. Williams, 44 N.J.Eq. 391, 14 A. 812.

9 Le Blume Import Co., Inc. v. Coty et al., 2 Cir., 293 F. 344, 351.

10 In Joseph Schlitz Brewing Company v. Houston Ice & Brewing Company, et al., 250 U.S. 28, at page 29, 39 S.Ct.

401, 63 L.Ed. 822, the late Mr. Justice Holmes, speaking for the court, said: "It often is said that the plaintiff must show a deception arising from some feature of its own not common to the public. United States Tobacco Co. v. McGreenery [et al.] (C.C.) 144 F. 531, 532, cited by the court below. But so stated the proposition may be misleading. It is not necessary that the imitation of the plaintiff's feature taken alone should be

The proposition that the designation "Pay Roll" has come to mean distinctively and exclusively the product of plaintiff flows from the following principles: Trade-marks are of two categories, one, technical trade-marks derived from coined words or generic words used in an arbitrary way, and two, generic words which have acquired a secondary meaning. Proof that a mark is unique when applied to a vendible commodity establishes a technical trade-mark and thereby raises a presumption that the mark identifies the plaintiff's goods. It is only with respect to secondary-meaning marks that the plaintiff must prove this identity as a fact. The difference, therefore, is wholly one of procedure. Said difference, however, is entirely immaterial in this case, as the plaintiff has proven that "Pay Roll" identifies only its product. It is unnecessary therefore to determine whether the mark is a technical trade-mark or a secondary-meaning mark.

It is true there is authority for the proposition that, where the front part of two trade-marks differ in appearance, sound and meaning, there is no infringement even though there may be identity of the last parts.[11] The present case does not come within the rule. The word "Cash" per se and the word "Pay" per se are not alike in meaning, sound or appearance but the difference (in meaning at least) disappears almost entirely when both words are combined with the word "Roll" to form "Cash Roll" and "Pay Roll", respectively. Even the word "Roll" takes on an additional connotation when thus combined. There is substantial similarity (if not identity) in meaning in "Pay Roll" and "Cash Roll" when each mark is considered in its entirety, and this similarity of meaning is enhanced when the simulation of coins on the package all add to the general effect and significance sought to be created by the trade-marks used.

The cases cited by National and identified by the following comparisons, can be distinguished. In said cases it does not appear the defendant was guilty of simulating plaintiff's dress of package or of adding in any way by such means to the significance of the marks there employed. Furthermore, the marks there in controversy, when considered in their entirety, did not take on a new and closer meaning, lacking when their component parts were considered separately. Concededly, "Honeymoon Pie" does not infringe "Eskimo Pie", "Armour Star", "Southern Star"; "Never Leak," "Roof Leak" or "Kentucky Tavern", "Town Tavern".

The fact that some of the composite trade-marks of the type under consideration are distinguishable to the eye and ear when seen or heard in their entirety is not the sole test.[12]

---

sufficient to deceive. It is a fallacy to break the fagot stick by stick. It would be enough if taken with the elements common to the public the inscription accomplished a result that neither would alone. New England Awl & Needle Co. v. Marlborough Awl & Needle Co., 168 Mass. 154, 156, 46 N.E. 386, 60 Am.St. Rep. 377."

[11] See Glenmore Distilleries Co. v. National Distillers Products Corporation, D.C., 23 F.Supp. 928, affirmed, 4 Cir., 101 F.2d 479, writ of certiorari denied, 307 U.S. 632, 59 S.Ct. 835, 83 L.Ed. 1515, and cases cited therein.

[12] "* * * it must not be overlooked that appeals to the eye and ear are but the means through which deceptive and false impressions are sought to be made upon the mind itself, and are consequently not exhaustive of the means by which unfair competition may be attempted or accomplished. As substantially the same thought may be suggested and aroused, the same mental reaction stimulated, the same picture brought before the mind's eye by words having neither the same physical appearance, spelling, pronunciation, nor sound—as, for example, the words 'same' and 'identical'—so the boundaries to the field of unfair competition are not so narrow as to exclude those means and forms of deception which do not depend upon direct ocular or auricular similitude.

"A trader, desiring to deceive, but not versed in the mental sciences, or in the method of implanting in the human mind through association of ideas or by suggestion a desired impression or belief, would probably use only such dress, marks, or names as would present directly to the eye or ear a deceptive resemblance to the dress, mark, or name of the trader having an established good will. But the trader, not more honest, but more skilled in the means and methods of confusing and deceiving the human mind, would probably resort as well to less direct, but not less successful, ways of accomplishing his aim. By such a person the power through suggestion to awaken the imagination and direct the mind to a predetermined goal would not be overlooked. But the law guards the good will of a trader—and thereby the

Defendant further contends that no one has the exclusive right to put out a candy "roll" or to monopolize the word "roll", that it has a right to use a wrapper (label) of the type employed by both Pecheur and National and that one should not be permitted to monopolize the simulation of a coin or coins or a particular color or colors.

■ It begs the question to argue that National is within its legal rights in respect to each individual act here involved. Of course, the defendant has a right to use the word "roll" and to package its product in the form of a candy roll. It has the right to put out its candy in the same size wafer, form and package. However, it does not have the right to market its product in such manner as to cause the public to mistake it for the product of Pecheur.[13]

While "Pay Roll" and "Cash Roll" are not synonymous, there is nevertheless a similarity in the significance of both expressions. Both connote money, and when to both expressions are added wrappers (labels) on which coins have been simulated, the resemblance is heightened.

■ The arrangement of the coins on National's package is remarkably similar to the arrangement of coins on Pecheur's package. It is more than a coincidence [14] and even though differences as well as similarities are apparent, when the packages are compared side by side, this is not the test.[15] In all cases of this kind the consumer is rarely, if ever, afforded an opportunity to make a side by side comparison. He must rely upon his memory.[16] "The person to be considered is the incautious purchaser".[17] In this case that incautious purchaser is usually a child and the English courts have given consideration to the fact that children are the purchasers of products such as gum and candy.[18]

The law is not made for the protection of experts, but is for the public—that vast multitude, which includes the ignorant, the unthinking and the credulous who, in making purchases, do not stop to analyze, but are governed by appearance and general impressions.[19] It is the casual or ordinary purchaser who must be protected and as to him the test is general appearance.[20]

Truth as a defense on the grounds that defendant's wafers are in the form of coins and when packed form a "Cash Roll" is insufficient. If the words "Cash Roll" described literally a roll of cash it would be telling the literal truth. Here, however, such is not the case. Both Pecheur in its use of "Pay Roll" and National in its use

---

public—against unlawful injury, and with equal care, whether the method of deception by which the injury is brought about is of the latter or of the former character." Williamson Candy Co. v. Ucanco Candy Co., D.C., 3 F.2d 156 at 158.

[13] Mason Au & Magenheimer Confectionery Mfg. Co. v. Chumas et al. (Same v. Alps Candies, Inc.), D.C., 275 F. 357.

[14] "While in suits of this character it is not essential to prove that the defendant intended to pass off its goods as those of the plaintiff, yet its intention so to do is by no means immaterial, because, if it be established that the defendant intended to deceive—intended that its goods should be passed off as the plaintiff's—it can rarely with effectiveness, and never with grace, say that its fraudulent conduct has not had, and will not have, the intended effect. * * * It would be a strain upon human credulity to believe that such and so many points of similarity as here found could innocently exist. See Yale & Towne Mfg. Co. v. Alder [2 Cir.] 154 F. 37, 83 C.C.A. 149; Putnam Nail Co. v. Bennett [et al.] (C.C.) 43 F. 800."

Williamson Candy Co. v. Ucanco Candy Co., supra.

[15] G. Heileman Brewing Co. v. Independent Brewing Co., 9 Cir., 191 F. 489, 497; Liggett & Myer Tobacco Co. v. Hynes, D.C., 20 F. 883.

[16] William Waltke & Co. v. Geo. H. Schafer & Co., 49 App.D.C. 254, 263 F. 650; Godillot v. American Grocery Co., C.C., 71 F. 873, 874; Scriven et al. v. North et al., 4 Cir., 134 F. 366, 379; Florence Mfg. Co. v. J. C. Dowd & Co., 2 Cir., 178 F. 73, 75.

[17] Battle & Co. v. Finlay et al., C.C., 45 F. 796.

[18] Nims on Unfair Competition and Trademarks, page 842; Matter of Application by Wheatley Akeroyd & Co., 37 R.P.C. 137 (Ch. Div. 1920).

[19] Florence Mfg. Co. v. J. C. Dowd & Co., supra; J. N. Collins Co. v. F. M. Paist Co., D.C., 14 F.2d 614.

[20] O. & W. Thum Co. v. Dickinson (Same v. A. K. Ackerman Co.), 6 Cir., 245 F. 609, 613; Auto Acetylene Light Co. et al. v. Prest-O-Lite Co., Inc., 6 Cir., 264 F. 810; Rymer et al. v. Anchor Stove & Range Co., 6 Cir., 70 F.2d 386; Chesebrough Mfg. Co. v. Old Gold Chemical Co., Inc., 6 Cir., 70 F.2d 383.

737

of "Cash Roll" are employing their respective designations in a figurative sense. Conceding for the moment that the situation is otherwise before absolving it on the ground that it was merely telling the truth, equity would first ascertain from the defendant's acts whether or not it intended to deceive the prospective purchasers of its products. In this type of case literal or formal truth is not enough. The question is: What impression will be made on the purchaser?[21]

We also have in this matter, shall we say; a defendant who is careful always to sell its goods as its own, but who puts them up in a style of package so similar to that used by one of its competitors, earlier in the market, that unscrupulous dealers, who purchase from the manufacturer or jobbers in order to sell at retail to consumers are enabled to delude numerous of such retail purchasers by giving them the goods of the defendant as those of the plaintiff. It seems apparent this is unfair competition, both on reason and authority.[22]

■■■ Before we close, brief reference should be made to an emissary of the plaintiff, employed to make a certain purchase and although he asked for "Pay Roll" he was given "Cash Roll". The defendant dismisses this incident in its brief with the statement: "The boy made no objection when handed 'Cash Roll'. He wasn't deceived." It is immaterial whether or not he was deceived. The sale disclosed the dealers' intent and purpose just the same as if it had been made to one who was deceived,[23] and the argument that National is not responsible for the conduct of an independent jobber or retailer is answered by saying the manufacturer is liable when he knowingly or unknowingly puts into the hands of the jobber or retail dealer the means of deceiving the ultimate purchasers.[24] But even if we were to hold there is no evidence of confusion, when injury to the plaintiff's business is threatened or imminent, though no person is shown to have been deceived, a court is authorized to intervene to prevent its probable occurrence. The originator of a brand or trademark is not required to wait until the wrongful use has been continued for such a time as to cause substantial pecuniary loss,[25] or to put it another way, the probability of confusion and deception is sufficient to justify the aid of equity.

### Conclusions of Law.

■■■ National's use of the designation "Cash Roll" is an infringement of Pecheur's designation "Pay Roll".

National's package is deceptively similar to Pecheur's package and its use thereof is likely to cause confusion of the purchasing public and amounts to unfair competition.

Judgment is directed in favor of Pecheur Lozenge Co., Inc., and against National Candy Company, Inc., on the cross-claim of National Candy Company, Inc., and in favor of Pecheur Lozenge Co., Inc., and against National Candy Company, Inc., on the complaint, and National Candy Company, Inc., shall account for and pay over to Pecheur Lozenge Co., Inc., such gains and profits as have accrued or have arisen or have been earned or received by National Candy Company, Inc., and all such gains

[21] Delaware & H. Canal Co. v. Clark, 13 Wall. 311, 80 U.S. 311, 20 L.Ed. 581.

[22] Reid, Murdoch & Co. v. H. P. Coffee Co., 8 Cir., 48 F.2d 817.

[23] Julius Kessler & Co. v. Goldstrom, 8 Cir., 177 F. 392; Lever Bros., Limited v. Pasfield, C.C., 88 F. 484; Badische Anilin & Soda Fabrik v. A. Klipstein & Co. et al., C.C., 125 F. 543; Hennessy et al. v. Wine Growers' Ass'n, D.C., 212 F. 308, 310. "* * * it is the truth that is to be ascertained; and, if to get at the facts which are essential to sustain an issue upon which valuable property rights depend, circumstances make it impossible to obtain evidence of disinterested persons, it none the less becomes the solemn duty of the court to work to a correct finding, and in doing so to weigh all evidence, no matter whether given by interested or disinterested witnesses." Hennessy et al. v. Wine Growers' Ass'n, supra.

Coca Cola Co. v. Gay-Ola Co., 6 Cir., 200 F. 720, 722, 723: "Accordingly, we find it recognized by this court that, in a suit for unfair competition, it is not necessary to show that the immediate purchasers were deceived as to the origin of the goods; but even if they thoroughly understand that they are buying the counterfeit, and not the genuine, the manufacturer of the counterfeit will be enjoined from selling it to dealers with the purpose and expectation that it shall be used by the dealers to deceive the consumer."

[24] Lever v. Goodwin, 36 Ch.Div. 1.

[25] Amoskeag Manufacturing Company v. David Trainer et al., Trading as D. Trainer & Sons, 101 U.S. 51, 25 L.Ed. 993.

738

and profits as would have accrued to Pecheur Lozenge Co., Inc., but for National Candy Company, Inc., together with costs and disbursements.