## LANDIS MACHINERY CO. v. CHASO TOOL CO., Inc.

### No. 9524.

Circuit Court of Appeals, Sixth Circuit.

April 4, 1944.

William A. Strauch, of Washington, D.C. (Strauch & Hoffman, William A. Strauch, James A. Hoffman, and J. Matthews Neale, all of Washington, D. C., on the brief), for appellant.

Arthur Raisch, of Detroit, Mich., for appellee.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

In Mercoid Corp. v. Mid-Continent Inv. Co., 320 U.S. 661, 64 S.Ct. 268, the rule of Carbice Corp. v. American Patents Corp., 283 U.S. 27, 51 S.Ct. 334; 75 L. Ed. 819; Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371, and Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363, wherein it had been held that the use of a patent for a machine or process to secure a partial monopoly in supplies consumed in operation or in unpatented materials employed in it, barred recovery for infringement, was extended to cover unpatented material or devices which are themselves an integral part of the structure embodying the patent. The result of the decision, it was said, "is to limit substantially the doctrine of contributory infringement."

A careful study of the opinion, together with its interpretation by the dissenting Justices, and a consideration of the doubt implicit in the observation "what residuum may be left we need not stop to consider" leads to the conclusion that nothing has been left of the doctrine as formerly it had been applied to the furnishing of unpatented parts integral to structures embodying patented combinations. Whether this bodes good or ill for the continuation of industrial progress under the aegis of the patent laws, it is not for us to say. May we, however, without impropriety, suggest a doubt whether, for practical purposes, much is left of that other doctrine, that a combination of old elements is inventive if it produces a new and useful result, for if one supplier may furnish an integral part specifically intended for use in the patented combination, with no other use apparent, without being guilty of infringement, other manufacturers may do likewise in respect to other parts. The result may be that only he is an infringer who furnishes all of the elements of the patented combination and integrates them into operating embodiment, and so in many cases, the only infringers, as the present case illustrates, are the ultimate consumers whom it would be fruitless to pursue in the enforcement of patent rights.

The present infringement suit, however, poses determinative issues other than the question of contributory infringement upon which the case confidently may be decided. The Mercoid doctrine being but newly announced and the full sweep of its implications not too clearly grasped, it may not be inappropriate, without disrespect to the court, and with no thought of questioning the controlling authority of its opinion, but awaiting its specific application in other cases, to base decision upon principles fixed in the law by the passage of time and repeated adjudications, since it may here be done, to the end that novel doctrine may more safely guide us when fully crystallized, without our own unnecessary contribution to the process.

Involved in the present controversy are 14 patents, listed in the margin,[1] for various improvements in die heads for cutting threads in mass production. Each patent utilizes cutters, called "chasers" in the present art, of the tangential type. Four of such chasers are used at the same time, being held in the head so that one end of each bears on the work while the rest of it proceeds at a tangent. The holders are designed to present the chasers tangentially and at a proper angle to the work to produce the desired thread. The heads, in combination with holders and chasers, force the work into the die, and when the proper length of thread is completed, automatically open so that the bolt may be withdrawn without rotary reversal of the cutters, as in earlier art. It is conceded that the chaser patents have expired. The alleged infringement by the appellee consists of selling chasers for use in the patented combinations and re-building a small number of patented heads. The appellant also counted upon unfair competition because the accused chasers were sold in containers deceptively similar to those of the appellant. The defenses were invalidity based on anticipation, denial of right to equitable relief when patent monopoly is sought for unpatented elements, violation of the Clayton Act, 38 Stat. 730, denial of monopoly over replaceable and expendable elements, and denial of unfair competition. The appellee counterclaimed under the Clayton Act but waived its right to treble damages.

All issues were resolved in favor of the defendant. The court dismissed the plaintiff's bill but ordered an injunction upon the defendant's counterclaim, restraining the plaintiff from attaching any notices to its chasers, die heads, or holders, requiring the purchaser to use its die heads only with chasers of its own manufacture or to use its chasers only with its die heads, or to lead purchasers to believe that they are bound to use both die heads and chasers manufactured by the plaintiff.

Before considering the defense of invalidity, whether based upon anticipation of the claims of the patents in suit by prior art, or because of the rule of Bassick Mfg. Co. v. R. M. Hollingshead Co., 298 U.S. 415, 425, 56 S.Ct. 787, 80 L.Ed. 1251, affirming our decision in 6 Cir., 73 F.2d 543, and Kodel Electric & Mfg. Co. v. Warren Telechron Clock Co., 6 Cir., 62 F.2d 692, wherein it was held that where a later invention consists solely of the improvement in one of the parts of an old combination but does not change the mode of operation, the patentee may not claim the broader combination, we give consideration to the holding below that the plaintiff misused its patents by attempts to extend its monopoly to unpatented material in the face of the rule of Carbice Corp. v. American Patents Corp., supra, Morton Salt Co. v. G. S. Suppiger Co., supra. This involves consideration of the plaintiff's business practice. Claiming monopoly under its patents for what it calls the "Landis system" of precision screw cutting combinations, it sells its die heads separately from its chasers because such heads are claimed to be useful as adjustable tool chucks as well as for thread cutting. As an inducement to the adoption of its heads and to meet the lower cost heads of its competitors, it sells its heads for uses other than thread cutting at low cost, relying upon chaser sales to cover development, service, and other costs, and to give it a reasonable profit. To negative an implied license that the patented heads may be used in thread cutting it restricts such use by a notice which clearly advises the purchaser that the heads may be used only for purposes other than thread cutting. Such notices recite that the heads and chaser holders which are sold separately from the Landis chasers, are protected by certain United States patents, that such patents also cover the use of the head and holders in combination with Landis chasers, but that every purchase of Landis chasers adapted for use with the Landis holders carries with it an express license to use the chasers in combination with the holders and the head. The notice given with the sale of chasers also lists the Landis patents and recites that the chaser

[1] Shearer 1,631,556, claim 14; Newman et al. 1,692,514, claims 6 and 12; Newman et al. 1,699,373 claims 32 and 34; Shearer 1,699,994, claims 2 and 9; Shearer 1,738,847, claims 1 and 4; Shearer 1,760,567, claims 1, 3 and 4; Shearer 1,760,568, claims 1, 8, 15 and 16; Harper 1,795,558, claims 2 and 5; Shearer 1,861,327, claims 1 and 4; Shearer et al. 1,874,643, claim 4; Reimschissel 1,951,290, claim 12; Reimschissel 2,082,757, claims 10, 23, 24 and 26; Reimschissel 2,082,758, claims 2, 3 and 5; Mathias et al. 2,154,006, claims 1, 6, 10, 11, 15 and 17.

carries with it a license for use with one or more of the patents, but only throughout the life of the chaser.

The plaintiff justifies this practice because of the complexity of its die heads, the great expense of its revision and instruction service, and a general trade practice developed in the industry long before it entered the field. All of the plaintiff's competitors, it is said, respected its rights and they were well understood by the trade until the defendant's infringing activities assumed serious proportions. The defendant, it says, was formed in 1934 to manufacture and sell chasers to be used in die heads of the plaintiff, and it markets only its profitable lines of chasers. The defendant makes no Landis system die heads, has never manufactured a head of its own design, and its chasers are unnecessarily exact and precise copies of the plaintiff's chasers in all essential particulars, and capable of no substantial use other than in the patented combinations.

In this situation it becomes necessary to consider the precise relation of the chaser to the die head and holder. The chaser is a cutting tool, and while from time to time its effectiveness may be renewed by grinding and sharpening, it would seem inescapable that it is an expendable element of the patented combination, and so under the rule of the cited cases, being itself unprotected by existing patents, may not be brought within patent protection. This view the plaintiff vigorously challenges on the ground that the chaser is the dynamic element of the patented combinations. Its contention is negatived by its own business practice. The restriction in the chaser license limiting it to their life, the availability of die heads for purposes other than thread cutting, and the repeated assertion that competitive conditions require that plaintiff make its profit through sale of chasers rather than die heads, support our conclusion. So do the recitals in the stipulation that purchasers of plaintiff's die heads and chasers, purchase chasers from the defendant to replace worn out chasers of the original combination. The rule that an expendable element in a patented combination may be replaced without infringement was quite early developed in the patent law, Wilson v. Simpson, 9 How. 109, 13 L.Ed. 66, and has been applied in numerous cases. The problem here varies only in degree from that in the Safety Razor cases, Gillette Safety Razor Co. v. Standard Safety Razor Co., 2 Cir., 64 F.2d 6; Gillette Safety Razor Co. v. Hawley, 2 Cir., 64 F.2d 10; American Safety Razor Corp. v. Frings Bros. Co., 3 Cir., 62 F.2d 416. Such reliance as the plaintiff places upon Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 325, 29 S.Ct. 503, 53 L.Ed. 816, would seem to be dissipated by the Carbice and Leitch cases. Finally, whatever doubt there otherwise would have been as to the chaser being a perishable element of the combination, must be resolved upon consideration of the colloquy between the District Judge and the plaintiff's general manager in respect to the basis of the plaintiff's business practice. Therein it was clearly conceded that the plaintiff's business had been built up on the idea of making the price of the head lower than it is worth so as to get the purchaser to buy the chasers, out of which the plaintiff made its profit. The court found that the chasers sold for about $9 a set in comparison with die heads selling for prices ranging from $90 to $350 without chasers. Its conclusion was that the chaser was a perishable element, and upon consideration of the whole of the voluminous record, we are unable to say that there was clear error in the finding.

■ We therefore find no error in a decree which dismissed the bill because the plaintiff had attempted to expand its monopoly to cover the unpatented chaser by notices which accompanied both chaser and die heads, and this result conforms to the conclusion in the Mercoid case, quite apart from the limitations there announced upon the doctrine of contributory infringement, for it was there said that even if there were an assumption that Mercoid was a contributory infringer and could have been enjoined for infringement, the same result would be reached because of the plaintiffs' misuse of the patent for the purpose of monopolizing unpatented material. Inasmuch as their misuse of the patent would have precluded them from enjoining direct infringement, they cannot stand in any better position with respect to a contributory infringer.

■ A charge of direct infringement is, in a few instances, based upon replacement of bushings and closing pins in the patented heads, and upon advertisements that the defendants would rebuild die heads for which it supplied chasers. If, under long accepted principles, this was reconstruction, there was infringe-

ment, and the plaintiff might secure relief if not barred by inequity. The evidence, however, was clear that pins and bushings were subject to wear, and when worn required replacement. In a careful consideration of the problem involved in distinguishing permissible replacement from impermissible reconstruction, this court in Automotive Parts Co. v. Wisconsin Axle Co., 6 Cir., 81 F.2d 125, 126, in rejecting a formula that determination must be based upon the "essence of the invention," concluded, that a more practical distinction rests upon a determination whether the new parts so dominate the structural substance of the whole patented combination as to justify the conclusion that it has been made anew. If it does, there is a rebuilding or reconstruction, and conversely where the original parts after replacement are so large a part of the whole structural substance as to preponderate over the new, there has not been a reconstruction but only repair. We find no reason to depart from this reasoning, nor do we find in the record any clear demonstration that what the defendant did in the few instances in which it reconditioned die heads, its replacements dominated the patented combination and so constituted rebuilding. It is unimportant that the parts replaced would, if properly used, last as long as the patented heads, Harris Calorific Co. v. Marra, 3 Cir., 95 F.2d 870, nor is it material that parts were replaced when only .partially worn in view of the emphasis placed upon precision in support of patentability. We conclude that the findings of the court, that there was repair rather than reconstruction in the accused practice, are sustained by the evidence, and find no error in its conclusion that the charge of direct infringement was unfounded.

The assertion of unfair competition is based upon the use by the defendant of metal boxes for its chasers identical with those of the plaintiff, made by the same manufacturer and of similar color. There is no evidence that the defendant made any effort to palm off its goods as those of the plaintiff, and there is no sound basis for drawing a conclusion that it intended to do so. O. & W. Thum Co. v. Dickinson, 6 Cir., 245 F. 609. There was little evidence of confusion. The defendant's chasers were clearly marked "Chaso" both on the container and on the chasers themselves, thus supplying the "antidote with the bane."

Rymer v. Anchor Stove & Range Co., 6 Cir., 70 F.2d 386; Estate Stove Co. v. Gray & Dudley Co., 6 Cir., 41 F.2d 462, 464. When we consider that the sales of chasers were made directly to manufacturing institutions and not to the general public, it would seem to be clear that little confusion was likely to result. Moreover, the plaintiff has no exclusive right to the color it had adopted, James Heddon's Sons v. Millsite Steel & Wire Works, 6 Cir., 128 F.2d 6, and there is no substantial proof that the color had come to have a secondary meaning denoting origin of its product. We find no error in the court's rejection of the plaintiff's contention that the defendant had engaged in unfair competition with it.

The court found that the plaintiff sold its chasers on condition that the purchaser would also buy its die heads for use with the chasers, and sold its die heads on the condition that the purchaser would also buy its chasers, and so concluded that this practice not only tended to create a monopoly for plaintiff in its die heads and chasers, but had created it, and that pursuit of such practices was a violation of the Clayton Act, Title 15 U.S.C.A. §§ 14 and 15. The appellant contends that no such condition was attached either to the sale of its die heads or its chasers. Expressly, that may be true—practically and by inescapable implication, it is not. The die heads are expensive even at the plaintiff's low selling price. Their most useful purpose is in thread cutting operations. It is idle to contend that they would have a substantial market merely as chucks or tool holders. They may not, however, be used in thread cutting without specific license obtainable only from the plaintiff and then only by purchase of its chasers. Compulsion is there whether expressed or not. Since the only justification for the monopoly thus sought over unpatented chasers is based upon the patent grants, and these proving of no avail for such purpose, the plaintiff's practices are clearly in violation of the anti-trust laws. That which the patent law does not authorize the Clayton Act specifically forbids. It applies to goods, wares, machinery, etc., whether patented or unpatented, and the provision was inserted in the Clayton Act for the express purpose of preventing rights granted by letters patent from securing immunity from the inhibitions of the act. United Shoe Mach. Corp. v. United

States, 258 U.S. 451, 460, 42 S.Ct. 363, 66 L.Ed. 708. There was no error in the decree granting the relief prayed by the defendant on its counterclaim.

We come finally to questions of validity raised by bill and answer. The District Court held each claim in suit invalid because of anticipation in the prior art. Having found the appellant without right to relief in equity because of an improper use of its patents, the questions here may now seem to be foreclosed. The appellant may, however, possibly have a right of action at law for damages, and, conceivably also, may, by change of business practices, be purged of inequity in respect to subsequent infringements, and so perhaps some question remains in respect to patent validity.

In Richard Irvin & Co. v. Westinghouse Air Brake Co., 2 Cir., 121 F.2d 429, it was concluded, in reliance upon Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263, that since it there appeared that the defendant did not infringe, the issue of validity had become moot, requiring reversal of a judgment of invalidity. The view has however, been urged in that Circuit with forcefulness, scholarship and copious annotation, though it has not yet prevailed, that where issues both of validity and infringement are raised in trial and upon appeal, if invalidity appears it should be adjudicated notwithstanding a conclusion that the patents are not infringed. Aero Spark Plug Co. v. B. G. Corp., 2 Cir., 130 F.2d 290 (concurring opinion of Judge Frank). It was there said that an adjudication of invalidity as an alternative ground of decision, is required by the public interest involved in every patent suit, and that while the crucial fact in the Electrical Fittings Corp. case was that a finding of validity in no way aided a plaintiff's position or weakened that of the defendant, and so could not conceivably be used as a ground for decision either alone or as an alternative to another ground, a holding of invalidity is entirely different. It is an alternative ground of decision—for which in other classes of cases there are many precedents.

This view may have much to commend it in the case of a simple patent where, on the face of the patent, invalidity clearly appears. We have, however, under consideration, 14 patents, most of them with multiple claims involving complex machines, 11 volumes of record, and an additional volume of prior art publications and patents. To what end shall we pursue our study of prior art and the recorded testimony of the experts scattered through the more than 4,000 printed pages, when if we arrive at conclusions in respect to validity, differing from those of the District Judge, we may not declare them, or direct an amendment of the decree to adjudicate validity proscribed by the Thomas & Betts case. Whether the questions of validity have become moot or not we decline to do it and express no views thereon.

The decree below is affirmed.