## HUGHES TOOL CO. v. UNITED MACH. CO. et al.

### No. 823.

District Court, N. D. Texas, Fort Worth Division.

Jan. 14, 1939.

George I. Haight, of Chicago, Ill., Jesse R. Stone, of Houston, Tex., and Marvin H. Brown, Jr., of Fort Worth, Tex., for plaintiff.

Jack A. Schley, of Dallas, Tex., and Elton M. Hyder, of Fort Worth, Tex., for defendants.

WILSON, District Judge.

This is a patent infringement suit brought by the plaintiff, Hughes Tool Company, a corporation, against United Machine Company, a co-partnership, and Leon L. Sanders, J. C. Street, and United Machine Works, a corporation, defendants, charging infringement by defendants of seven patents belonging to the plaintiff.

The patents in suit are all drawn to cover improvements in deep well drills in which a plurality of cutters surround and enclose the ends of cutter shafts projecting downwardly and inwardly from the drill head. The record shows that the plaintiff has built up through a period of years a large and extensive business in the manufacture and supplying of drill bits of this character to the drilling industry.

The patents in suit have been properly classified by the parties to the suit into two classes. Patents to Scott No. 1,480,014, Scott & Wellensiek No. 1,647,753, and Fletcher No. 1,856,627 have claims which are particularly directed to the surface conformations of the cutters used therein in combination with other elements, as fully appears from the patents and the claims thereof. All four claims of the patent to Scott, claims 2, 3, 4 and 5 of Scott & Wel-

lensiek, and claims 1, 2, and 3 of Fletcher are in suit. Patents to Wellensiek & Smith No. 1,905,079, Scott No. 2,011,084, Garfield & Scott No. 2,030,442, and Garfield No. 1,983,283 relate to the structure of the bearing supports upon which the cutters are mounted in combination with other elements.

The following claims of these patents are relied upon: Wellensiek & Smith, claim 1; Scott, claims 6, 7 and 8; Garfield & Scott, claims 1 and 7 to 15, inclusive; Garfield, all seven claims.

Plaintiff in its pleadings alleges ownership of the patents in suit, and their infringement by defendants. The defendants plead invalidity and noninfringement of the patents, alleging lack of invention in view of the prior state of the art. Defendants, on the trial, hardly denied they were infringing, if the patents were valid. They admitted the patents set forth mechanical improvements, but deny that they show invention.

The first two patents, Nos. 1,480,014 and 1,647,753, have previously been litigated and held valid. The first of these patents, No. 1,480,014, was held valid by the District Court of the Western District of Oklahoma in Hughes Tool Company v. Garber Tool Company et al., No. 1188 in Equity, and in Hughes Tool Company v. Southwestern Tool Company et al., No. 1494 in Equity in the same court, opinions not published.

The second of these patents also was held valid in the suit of Hughes Tool Company v. Chicago Pneumatic Tool Company, in the Western District of Oklahoma, No. 1563 in Equity. Both the Southwestern case and the Chicago Pneumatic case were appealed and the patents sustained by the Tenth Circuit Court of Appeals in Chicago Pneumatic Tool Company v. Hughes Tool Company, 97 F.2d 945, and Southwestern Tool Company v. Hughes Tool Company, 98 F.2d 42. In the above-cited Chicago Pneumatic Tool Company case, certiorari was denied by the Supreme Court on November 7, 1938, 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 415.

Drill bits of the type here involved employ cutters which roll on the bottom of the hole and disintegrate the formation being drilled. The cuttings are washed from the hole by flushing fluid which is pumped down through the center of the drill stem and returns outside of the drill stem, carrying the cuttings out of the hole with it.

Prior to the patents here in suit, drills of similar type were specialty tools which could be used only in hard or semi-hard formations. When soft or sticky formations were encountered, the cutters on the bits would become balled up with mud, fail to rotate, and consequently cease to cut. This necessitated pulling the drill stem from the hole, removing the rock bit, attaching a bit adapted to cut soft formations, and then lowering the drill stem, involving great delays and expense.

The patent to Scott, No. 1,480,014, discloses a formation of circumferential rows of teeth on each cutter and then mounting them on a bit head so that the teeth on one cutter interfit between the rows of teeth on the adjacent cutter. The teeth thus are adapted to clear each other of the material tending to adhere thereto in use in soft formations.

The patent to Scott & Wellensiek, No. 1,647,753, discloses the formation of widely spaced circumferential rows of long and chisel-shaped teeth on cutters and then mounting the cutters on a bit head so that when the cutters rotate the teeth deliver a downward chisel-like stroke on the formation being drilled. The rows of teeth are spaced widely apart so as to obtain wide clearance and allow for the displacement of the material, being drilled into the spaces between the teeth, by the flushing fluid. These teeth not only result in the better cutting of the material but they assure the turning of the cutter as the bit head rotates upon the bottom and enables the driller to cut soft formations as well as hard. The driller can thus drill a varied formation without pulling the bit from the hole when soft formation is encountered, as was previously necessary.

■ Drillers testified that they had drilled in the Tonkawa oil fields in Oklahoma, using the equipment common in the oil fields prior to the inventions of these two patents. These drillers subsequently drilled in the same oil fields, using the identical equipment except for the bits. On the second occasion they used the "Acme" bits of plaintiff which embodied the inventions of Scott No. 1,480,014 and Scott & Wellensiek, No. 1,647,753. The time consumed in drilling a well was cut down to about one-fourth and the number of sets of drills employed in drilling a well was also cut down to about one-fourth of the previous number. The inventions, judged from such facts and their almost universal commercial acceptance, appear to be important and meritorious, each invention contributing a marked advance to the drilling art. None of the patents cited by the defendants to show anticipation of these patents is at all convincing. I hold these two patents are not anticipated and that they involved invention. If I were in doubt as to the validity of either of them, in accord with well-accepted rules of comity, I would be constrained to follow the holdings of the Circuit Court of Appeals of the Tenth Circuit in the absence of a showing of obvious error, and resolve all doubts in favor of the validity of the patents. Cincinnati Butchers' Supply Co. v. Walker Bin Co., 6 Cir., 230 F. 453, 454; Gormley & Jeffery Tire Co. v. United States Agency, 2 Cir., 177 F. 691. The claims sued upon of these patents are valid.

■ Fletcher No. 1,856,627, which is also an important patent materially advancing the practical drilling art, discloses the placing of the teeth longitudinally of the cutter, in staggered relation, so that they do not line up longitudinally of the cutters. By staggering the teeth longitudinally of the cutter, there are fewer teeth in contact with the bottom of the hole at any one time than where the teeth were arranged in rows longitudinally of the cutter and thus better penetration of the formation is obtained due to the fact that a fewer number of teeth have to support the full weight of the bit and drill stem. This also prevents the tracking of the teeth upon the bottom of the hole, preventing the formation of depressions upon the well bottom. Further, the teeth are formed of uniform size from base to apex of the cutter, thus obtaining better cutting effect especially toward the apex of the cone where they were previously made smaller and shorter. The drilling art was materially advanced through these improvements. The Fletcher patent was a material improvement over prior structures, and does not appear to have been anticipated.

The patents which were cited by defendants as anticipations of the Fletcher invention do not show the structure there disclosed. It is a novel and meritorious structure, involved invention, and the claims of that patent are valid.

The Wellensiek & Smith patent, No. 1,905,079, discloses a combination including an inner raceway between the shaft

and the cutter, in which balls are inserted through an opening in the head and shaft longitudinally of the shaft, said opening being then filled by a plug fitting therein and acting to hold the balls in the raceway. These balls serve to space the cutters slightly from the shaft so that the slush lubrication employed in the operation of the drill can circulate around the bearings and act as lubrication therefor and prevent overheating of the bearings. Inserting the row of balls through the head of the drill overcame the necessity, previously encountered in the use of anti-friction bearings in drills, of cutting an opening in the cutter itself to allow the insertion of the balls. The cutter could thus be made strong enough to withstand the hard usage to which it is put. By thus mounting the cutters, so that they can more readily rotate upon the shaft and assure against locking of the cutter through heating and resulting friction, it is possible to operate without the necessity of lubrication.

The Scott patent, No. 2,011,084, shows a combination in which the shaft upon which the cutter is mounted has a transverse opening for the insertion of ball bearings. By placing the opening for the insertion of the balls in this position, a row of balls is used not only as anti-friction members but also as a means of locking the cutter upon the shaft.

The patent to Garfield & Scott, No. 2,030,442, shows a combination with roller and ball bearings between the shaft and the cutter, the ball bearings positioned so as to hold the cutter on the shaft and to take the thrust longitudinally of the shaft; the roller bearings so positioned as to take the bearings thrust transversely of the shaft. The placing of the rollers set out in a combination including the ball bearings, which act to hold the cutter upon the shaft, added materially to the success of the roller bearing type of drill.

The patent to Garfield, No. 1,983,283, has relation to the bearings but pertains particularly to a combination which includes the construction of the shaft upon which the cutter is mounted. Prior to Garfield's invention, the shaft is said to have worn materially, especially toward the forward end thereof. To overcome this difficulty an inserted bearing pin was employed fitting within an opening in the forward end of the shaft, said bearing pin being made of hard abrasion-resisting material. The specification of the patent, in referring to previous forms of drills wherein the inserted bearing pin was not present, states (P. 1, col. 1, lines 5–20): "On drills of this character there are normally two or more cutters mounted on shafts on the bit head which shafts are inclined downwardly and inwardly toward the central axis of the drill. As the thrust of the drill is downwardly, this force is taken upon bearings set at an inclination to the direction of thrust, and provision must be made to assure that the cutter rotates freely on the shaft and that the cutter also be held from a tendency to be twisted or skewed longitudinally around the end of the shaft. There must be means at the end of the shaft to take up the lateral exponent of the thrust which means must be tough and not easily fractured, and which must also be resistant to abrasion."

The witness Kuldell made a most favorable impression on me as an expert, and in discussing the value of this improvement stated: "It is of extreme importance that the cone remain in alignment with its axis during its life. If not the cone will tilt and drop at the end throwing the other bearing out of line. There is so very limited space within the cone at the nose, that it has been impossible to design a bearing that would take the thrust and at the same time carry the weight. The nose of the cone being smaller in diameter, turns relatively slower as compared to the heel of the cone because both make the same number of revolutions per minute, but the heel has to travel many times as far as the nose because of its enlarged diameter; therefore, the surface speed at the nose of the cone is less than it is at the heel. A plain bearing will carry the load and stand up under that slower speed. The advantage which Garfield obtained in his invention is that he could make a bearing which he inserted in the nose of the cone out of ideal material for that purpose and not depend upon material out of which the whole bit was constructed. The bit must be constructed out of steel that is relatively tough and fairly soft. If it were given maximum hardness it would be too brittle. In Garfield's invention a metal can be inserted which has a tough interior, a strong core, and can be surrounded by a metal of extreme hardness and abrasive resistance. This is actually what is done. The pilot pin is covered with metal that is hard even at high tem-

perature. If that metal were applied to the body of the bit, it would soften the other bearing and reduce their efficiency. Garfield gave the bearing the ideal construction at the nose where it is most important that very little wear take place." (Trans. 78–80).

The defendants have introduced a number of prior art patents which are alleged to show anticipation and lack of invention in the last four patents discussed. The prior art patents set out as anticipating the claims of these patents are not cited against any particular one of the patents but generally against all of them. The best that can be said relative to these prior patents is that they show that it was not new to use anti-friction bearings with relation to the rolling cutters of well drills, but none of the patents cited show the respective inventions covered by claims of these patents relied upon. The patents to Zublin Nos. 1,758,814 and 1,784,476, show the use of one row of balls inserted between the cutter and the shaft in a manner which necessitates the removal of a portion of the shank of the bit in such way as to materially weaken the structure. No roller is shown and only one row of balls is shown and the claims counted upon in these four bearing patents in suit are clearly not anticipated by either of the two Zublin patents.

The patent to Decker, No. 1,756,285, does not show the use of anti-friction bearings but simply shows the use of a ring of solder poured within cooperating grooves in the shaft and the cutter to hold the cutter in position.

The patent to Childs, No. 1,652,348, also shows the use of a row of balls fitting within a raceway in the cutter and the shaft, but these balls have to be inserted into position within the raceway before the cutter is mounted upon the head of the bit. They cannot be inserted through a transverse opening into the raceway while the cutter is mounted upon the drill. Each of the patents cited have been carefully examined but I am of the opinion that none of them show an anticipation of the structure called for by the various claims of the bearing patents. In fact the defense of anticipation here is rather mosaic. It consists of scrap ideas taken largely from a heap of discarded patents.

■ The defendants have set out the defense that the Garfield & Scott patent, No. 2,030,442, is void for double patenting. This defense is based upon the allegation that the patent to Garfield, No. 1,983,283, being issued prior to the Garfield & Scott has no claims therein whatever to an inserted pilot pin which is the novel feature of all of the claims of the patent to Garfield. Furthermore, the claims in the Garfield Patent, No. 1,983,283, are all drawn to a combination including the inserted pilot pin. There could, therefore, be no double patenting. Suffolk Mfg. Co. v. Hayden, 3 Wall. 315, 70 U.S. 315, 18 L.Ed. 76.

The commercial success of the well drills, employing the inventions set forth in the claims relied upon in the four respective bearings patents which have been considered, is as marked as were the improvements involving the cutting surface of the cones.

■ In respect to the advances in the art, made by the inventions of these bearing patents over the prior advances made by the plaintiff in the drilling art through the other patents in suit, drillers testified most convincingly that they were able to drill from the 2,400 foot level to the 3,550 foot level in the Urbana, Arkansas, field using plaintiff's bits embodying the inventions of the four patents just referred to in less than one-half the time required theretofore, using less than half as many bits. The record further discloses that these inventions enabled drillers to discard the old lubricator, the use of which caused considerable delay. The record of practical success of the inventions, as shown by the almost universal commercial acceptance of all the patents, here challenged, of itself, is strongly persuasive in favor of validity.

■ Where substantial advance is made courts should interpret the claims of a patent so as to protect the invention. In Webster Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L.Ed. 1177, the Supreme Court said of Webster's improvement in looms: "It was certainly a new and useful result to make a loom produce fifty yards a day when it never before had produced more than forty; and we think that the combination of elements by which this was effected, even if those elements were separately known before, was invention sufficient to form the basis of a patent."

See, also, Consolidated Rubber Tire Co. v. Firestone Tire Co., 2 Cir., 151 F. 237; Luminous Unit Co. v. Freeman-Sweet Co., D.C., 249 F. 876.

No one prior to these inventors saw the solution of the problems which were involved. These problems had long confronted the art. In Expanded Metal Co. v. Bradford, 214 U.S. 366, at page 381, 29 S. Ct. 652, at page 656, 53 L.Ed. 1034, the court said: "It may be safely said that if those skilled in the mechanical arts are working in a given field, and have failed, after repeated efforts, to discover a certain new and useful improvement, that he who first makes the discovery has done more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor."

It is often easy, when some one has thought of something we had never thought of, after we clearly understand it, for us to think there is nothing so wonderful about it. But the highest evidence of discovery is how that part of the public, whose business the thought affects, takes to that thought and uses it to advance and promote their particular business. If they do so to the point of practical unanimity, whether it consists of a single new idea or a new combination of old ones, it is well-nigh conclusive proof of discovery. We have just such a case here. Every one of these patents received marked public recognition. It is no answer that the older ones were, in a measure, displaced by the later ones. As to the merits and acceptance accorded by the oil fraternity to plaintiff's patents, the evidence is undisputed. It should not be in defendants' mouths to challenge this, since all they ask is to be let alone to engage exclusively in the business of making plaintiff's patented devices.

The defendants produce bits which are almost identical with the bits manufactured by plaintiff. The devices manufactured by the defendants clearly infringe all of the claims counted upon in all of the patents in suit. Claims 1, 2, 3 and 4 of the Scott patent, No. 1,480,014, are each infringed. This is apparent from a reading of these claims upon the accused devices. Likewise, claims 2, 3, 4 and 5 of the Scott & Wellensiek patent, No. 1,647,753, and claims 1, 2 and 3 of the Fletcher patent, No. 1,856,627, plainly read upon the accused devices.

Turning to the patents which relate to the means for mounting of the cutters in combination with other elements, the accused devices have all of the elements of claim 1 of the Wellensiek & Smith patent, No. 1,905,079, and infringe this claim. Claims 6, 7 and 8 of the Scott patent, No. 2,011,084, are relied upon and are infringed. Claim 7, an illustrative claim, reads: "A roller bit having a head; a bearing having a raceway and a bore leading transversely into said raceway; a cutter to enclose said bearing; said cutter having a raceway; balls; and a plug; said balls being insertable through said bore into said raceways and said plug being insertable into said bore to hold said balls in said raceways when said bearing is on said head and said cutter is on said bearing, to rotatably lock said cutter on said bearing."

The accused devices have each of the specified elements.

Claims 1 and 7 to 15, inclusive, of the Garfield & Scott patent, No. 2,030,-442, are relied upon. I find that the accused devices infringe each of these claims. All seven claims of the Garfield patent, No. 1,983,283, are relied upon and all are infringed.

Defendants are exclusively in the business of repairing, as they call it, plaintiff's bits. They contend that even though the claims relied upon are held to cover the accused devices, their acts here complained of do not constitute infringement of the patents in suit, under the rule of permissible repair.

What they do is substantially this: New material is welded onto the old teeth upon the cutter shell to build up new teeth thereon. Also in some instances the interior of the cone shell is built up by the addition of welded-on metal thereon. The cones are then heat treated and annealed and the teeth cut to the original shape and size. The cones are next hardened by heat treating and then hard surfacing is applied to the teeth. When finished, the cutter is substantially identical with the original cone. There is such a striking similarity between defendants' repaired and plaintiff's manufactured cones, when I made a last visit to inspect the exhibits, though accompanied by an expert mechanic, we could not be sure whether we were examining a drill bit of the defendants' or one of the plaintiff's, without looking at the exhibit initials. This is true despite the fact when defendants get the drill bits for repair, the teeth, not one but all, are practically worn off down to the cutter shell; in any event, down to a point of utter uselessness for the purposes originally made.

When required, the shafts of the bit head are also built up by welding metal thereon and are machined smoothly into their original shape and size. The cutters are mounted upon the shafts and new balls and rollers are supplied to take the place of those which are worn. The cutter is then locked upon the shaft by the insertion of a plug or pin into the opening in the shaft through which the row of retaining balls was inserted.

It is plain both in principle and in view of the pertinent decided cases that this rebuilding or any building-up of the worn teeth of the cutters is not a mere "sharpening" of the cutters as defendants contend, but is a reconstruction that infringes the claims relied on of the Scott & Wellensiek patent, No. 1,647,753, and the Fletcher patent, No. 1,856,627, respectively. When the cones are mounted to "interfit", it is an infringement of the Scott patent, No. 1,480,-014, as well. The use by the defendants of metallic material of the used bits to make these devices is no less an infringement than would be the use of new metal therefor.

The same observations are applicable to the bearing patents in suit in respect to the building up of the used device with new metal in the worn ball raceways or roller raceways or similar parts.

In Southwestern Tool Co. v. Hughes Tool Co., 98 F.2d 42, the Circuit Court of Appeals for the Tenth Circuit held on similar facts that the claims here relied upon of the Scott patent, No. 1,480,014, and the Scott & Wellensiek patent, No. 1,647,753, were infringed and that the defendants in that case were not exercising permissible repair. The same reasoning leads to the conclusion that the claims of the Fletcher patent, No. 1,856,627, here relied upon are infringed and that the defendants are not merely repairing the cutter surface. In the Southwestern case, the court, also, held that the defendants were not merely repairing the means of attachment there in suit but were infringing the Godbold & Fletcher patent, No. 1,320,384. Although the patents here in suit which include means for attachment of the cutters to the bit heads differ in form from the means shown in the Godbold & Fletcher patent there in suit, the cases are analogous and that decision is persuasive here. Additional authorities which lead to the same conclusion are: Morrin v. Robert White Eng. Works, 2 Cir., 143 F. 519; Shickle, etc., Co. et al. v. St. Louis Car-Coupler Co., 8 Cir., 77 F. 739; Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co., 152 U.S. 425, 14 S.Ct. 627, 38 L.Ed. 500; Davis Electrical Works v. Edison Elec. Light Co., 1 Cir., 60 F. 276; American Cotton-Tie Co. v. Simmons, 106 U.S. 89, 1 S.Ct. 52, 27 L.Ed. 79.

The defendants contend that since they in instances worked on Hughes Tool Company bits at the request of drillers possessing them, they should not be held for infringement. This is unsound. I have pointed out that what defendants did was to reconstruct and without right. The drillers had no such right and would not have possessed it had title to the bits been in them. Of course a patented device may be repaired without infringement, if what is done is repairing in the sense of that word as applied to patented articles. The truth is what the defendants do is not repairing in any sense. It is rebuilding. In fairness to defendants, it must be said they do a good job of repairing or rebuilding, whichever it may be. However, it is by doing such a complete and thorough job that defendants are able to, and do, commit a very great fraud upon the patent rights of plaintiff, assuming its patents are valid, in this. The bits rebuilt by defendants practically doubles the life and usefulness of the bits. They are just about as good as new ones. This, of course, enables defendants to compete with plaintiff in selling its patented article, and if let alone, it would become a most serious menace to plaintiff's business. Its plant at Houston, Texas, now covers approximately 72 acres. It sells its bits almost everywhere in the world where oil wells are drilled. Others would also set up in this so-called business of repairing plaintiff's bits. The rebuilt bits being just about as good as new ones, defendants in making their repair contracts, are, in practical effect, able to, and do, undersell plaintiff. They fix a price just enough under plaintiff's sale price to get the business. The cost of the new parts, and material, defendants use on a job is comparatively small, just a few dollars. In other words, the money making secret or success of defendants' business is in selling plaintiff's patent.

In addition, the issue was raised, and plaintiff adduced testimony to show that defendants have no right to rework the Hughes bits because they are the property of the plaintiff. That evidence shows that

title to the bits remains in plaintiff at all times. Upon each bit is stamped "Property of Hughes Tool Co." The plaintiff's catalog and each delivery ticket bears the legend: "Hughes Roller Rock Bits, Drag Bits and core bits heads are never sold but are leased. When the original cutter teeth or bearings have served their useful life, the user will surrender the bits to Hughes Tool Company upon request. In accepting delivery, the user agrees not to surrender any of the tools as mentioned above to others, other than a duly authorized representative of the Hughes Tool Company."

The defendants could, certainly, acquire no right from such a lessee to reconstruct, since he had no such right to exercise or to transfer. Indeed, the lessee is obligated to turn the plaintiff's bits back to the plaintiff and to no other. There was some evidence of advertising, and a course of dealing, by plaintiff which, of itself, would indicate that plaintiff did not seriously consider itself as the owner of these bits after they passed, for a consideration, into the hands of drillers; that it then regarded the bits as sold and in no sense leased. To my view the evidence was explained by plaintiff in a satisfactory way. It follows, defendants' conduct is without right on this ground alone. However this is unimportant since, leased or sold, infringement by the defendants of valid patents has been clearly shown.

In pursuance hereof, the parties may submit proposed findings of fact, conclusions of law, and a form of decree.