## WILLIAMS v. HUGHES TOOL CO.

### No. 3915.

United States Court of Appeals,
Tenth Circuit.

Dec. 2, 1950.

Rehearing Denied Dec. 29, 1950.

Robert F. Davis, Washington, D. C., and Charles M. McKnight, Tulsa, Okl., for appellant.

George I. Haight, Chicago, Ill. (Edward A. Haight, Chicago, Ill., Robert F. Campbell, Houston, Tex., Ray L. Smith, Houston, Tex., Lynn Adams, Oklahoma City, Okl., on the brief), for appellee.

Before PHILLIPS, Chief Judge, and BRATTON, HUXMAN, MURRAH and PICKETT, Circuit Judges.

PHILLIPS, Chief Judge.

This is an appeal from a judgment adjudging two patents owned by Hughes Tool Co.[1] valid and infringed, and that Williams had interfered with the contract rights of Hughes under leases by which it licenses the use of the patented devices.

Williams pleaded invalidity, non-infringement, and misuse of the patents and by counterclaim sought damages for injury to his business and reputation, and an injunction restraining Hughes from alleged unfair competition.

The patents in suit are Fletcher No. 1,-856,627 and Scott and Garfield No. 1,983,-316. They relate to rotary drilling bits used

1. Hereinafter called Hughes.

in drilling for oil and gas. The Fletcher patent was held valid in Williams Iron Works Co. v. Hughes Tool Co., 10 Cir., 109 F.2d 500, and the Scott and Garfield patent was held valid in Robertson Rock Bit Co. v. Hughes Tool Co., 5 Cir., 176 F.2d 783.

Prior to the Fletcher patent the teeth on rotary bits were arranged in rows longitudinally of the cutters and diminished in size from the base to the apex of the cutters. Due to the fact that the teeth near the apex of the cutters were smaller and all the teeth in each longitudinal row simultaneously came in contact with the formation at the bottom of the hole, the maximum of penetration by the teeth into the formation was not obtained. Furthermore, teeth arranged in longitudinal rows had a tendency to track in the same depressions in the formation each time the cutter revolved, thereby lessening the efficiency of the cutter.

The Fletcher device embraces a head with shafts mounted thereon and approximately frusto-conical shaped cutters mounted on the shafts. The teeth are arranged in circumferential rows around the cutters, but longitudinal of the cutters they are staggered, so that the teeth in each row are out of alignment longitudinally with the teeth in the rows adjacent thereto. Each row of teeth has a lesser number of teeth than the next outer adjacent row. The teeth are chisel-shaped and approximately uniform in size and pitch, except that those in the outer row may be slightly longer than the others.

By designing a cutter with teeth of approximately equal size and pitch from the base to the apex of the cutter and teeth out of alignment longitudinally, Fletcher overcame the defects we have adverted to in the prior cutters. The teeth, being of approximately equal size, have substantially equal penetration and wearing life. This increases the effectiveness and the useful life of the cutters. The staggered arrangement of the teeth eliminates the tendency of the rows of teeth to track and to bounce from one row to the other as the cutter revolves, and effects uniform cutting of the entire bottom of the hole. It also results in the weight of the drill being brought to bear upon a lesser number of teeth as the rota-

tion of the cutter brings the teeth in contact with the formation, thereby increasing their penetration and effectiveness. Fletcher's device was a smoother-operating, faster-cutting, more efficient, and longer-lived drill than the bits of the prior art. So great were the improvements that Hughes immediately discarded a large number of costly machines used in manufacturing the older type of cutters and supplanted them with machines adapted to manufacture cutters embodying the Fletcher patent and thereafter incorporated Fletcher's conception into the cutters which it manufactured.

The Fletcher patent was not anticipated by Griffin patent, No. 1,195,208. The cutters in Fletcher are frusto-conical cutters, which, as the bit is rotated, revolve, and bring the cutter teeth into contact with the bottom of the hole to chip and crush the rock or other strata. Griffin discloses a pair of hemispherical cutters so arranged that the teeth contact both the bottom and side of the hole. Fletcher discloses circumferential rows of teeth separated by grooves, with the teeth out of alignment longitudinally of the cutter, and the number of teeth diminished in each succeeding row from the base to the apex of the cutter, thus permitting inner teeth of ample size and eliminating tracking of longitudinal rows. Griffin discloses hundreds of different conical projections nested together as closely as possible. It discloses no alternate rows of teeth and grooves and no suggestion of longitudinal alignment or staggering of teeth in different rows. The only staggering is that which incidentally results from the crowding of many teeth on the cutter. While it does not appear that the Griffin device has ever been used, it is obvious that with such device it would be difficult to maintain a straight hole, to keep the teeth clean and to prevent them from balling up; and it would lose gauge very rapidly, have poor penetration and a very short life.

Neither was Fletcher anticipated by Hughes No. 1,119,163. This patent was pleaded unsuccessfully in Robertson Rock Bit Co. v. Hughes Tool Co., supra. Hughes shows a pair of cutters. Each of these cutters has but a single circumferential set or row of teeth, each tooth extending from

the base of the cone to the apex. These teeth grow smaller toward the apex of the cutter, and they diverge from the apex to the base of the cutter. There is no staggering of teeth in adjacent rows on a cutter and the teeth on the two cutters are aligned longitudinally.

We adhere to our former decision sustaining the validity of the Fletcher patent.

The Scott and Garfield patent discloses a well drill comprising a head, three downwardly and inwardly inclined cutter shafts on the lower end of such head, three cutters mounted on such shafts, teeth in circumferential rows on each of such cutters, offset longitudinally from the rows of teeth of adjacent cutters, and the rows of teeth on each cutter interfitting with the rows of teeth on the two adjacent cutters.

Prior to Scott and Garfield, non-interfitting three-cone bits were known to the art. An example is the bit disclosed by Hughes patent, No. 959,540. However, such three-cone prior-art bits were not used. The bits in daily use were two-cone bits. Prior to Scott and Garfield, Scott had invented a two-cone bit, in which the rows of teeth on the cutter interfitted into grooves between the rows of teeth on the adjacent cutter. Examples are the bits disclosed in Scott patent, No. 1,480,014, and Scott and Wellensiek patent, No. 1,647,753 (see discussion of those patents in Williams Iron Works Co. v. Hughes Tool Co., supra.) Prior to Scott and Garfield, it was regarded as impossible to form and position the teeth on the cutters of a three-cone bit so they would interfit in use, in other words, so the rows of teeth on each cutter would interfit into the circumferential grooves between the rows of teeth on the other two cutters.

The advantages of the Scott and Garfield three-cone bit over prior-art bits are these: It has a broader base, resulting from the use of three cones instead of two, giving a more uniform distribution of weight. It permits the use of longer teeth and will carry greater weight. It produces less torque and runs more smoothly. It produces less stress and shock on the component parts of the bit and the other drilling equipment, reducing fatigue failures. It may be rotated more rapidly. It maintains better gauge, making less reaming of the hole necessary. It is more easily cleaned. It increases drilling speed approximately 100 per cent. It lasts longer.

Because of the improved results obtained by the Scott and Garfield device, it almost completely supplanted the prior-art two-cone bits.

Scott and Garfield conceived a new combination of old elements, whereby new results were obtained and old results were obtained in a more facile, economical and efficient way. It is our conclusion that their conception arose to the dignity of an invention.

Moreover, the decision of the Fifth Circuit in Robertson Rock Bit Co. v. Hughes Tool Co., supra, was rendered upon facts substantially identical with those presented on this record, and that decision, while not binding on this court, is strongly persuasive under the doctrine of comity.[2]

Hughes does not sell the bits manufactured by it under the patents in suit. It leases them to users under a contract which provides that: "Hughes Roller Rock Bits and Core Bit Heads are never sold but are leased. When the original cutter teeth and/or bearing have served their useful life, the user will surrender the bits to Hughes Tool Company upon request. In accepting delivery, the user agrees not to surrender any of the tools as mentioned above to other than a duly authorized representative" of Hughes. Each bit is stamped with the words, "Property of Hughes Tool Co."

Hughes maintains an active research department and a large laboratory at Houston, Texas, equipped to test bits, make metallurgical investigations and chemical an-

alyses, and carry on other like research. It maintains a field organization of approximately 175 men. These men deliver new bits to the drilling rigs of the users and pick up the worn-out bits. On each delivery the user signs a delivery ticket bearing the lease agreement referred to above. Each bit produced by Hughes is given an identifying serial number, which enables Hughes' field organization to follow the history of each bit, and to maintain records of footage drilled, hours run, weight carried, speed of rotation, quantity of fluid circulated and formations drilled. In other words, field men follow the life of the bit from the time it is received by the driller until the time it has served its useful life. They make certain that the right type of bit is delivered for the particular drilling conditions existing at each drilling rig. The field man examines the bits picked up and if he thinks further examination is desirable, sends them to Houston. Many of the bits are sent to the laboratory at Houston for further examination, accompanied by information with respect to each bit as to the conditions of use, the formation drilled and its performance. Laboratory tests produce further information. The information gathered by Hughes'. field organization as to the performance of the bits in particular formations and areas under specific conditions is made available to users of Hughes' bits and is of substantial value to them.

Ordinarily, when the teeth of a bit have become so worn from use that the original cutter teeth have served their useful life, the bearings are practically worn out and the useful life of the bit is at an end. Generally, a bit once placed in use in a hole is not withdrawn until its useful life has ended. However, in a limited number of the bits the bearings survive the life of the original teeth, and the restoring of the original teeth by retipping makes possible the further use of such bits in the drilling of soft forma-tions. One of Williams' witnesses testified that only a small percentage of the bits used by his company could thus be retipped. Another witness for Williams, a drilling contractor, placed the percentage at 12 to 15 per cent.

Williams is engaged in the business of retipping bits on which the original teeth are worn out, and returning the bits to the lessees thereof for further use. Williams first washes the bits. With an acetylene torch and tungsten tube metal, he then restores each worn tooth as nearly as possible to its original form, size and position. He keeps the bit and those teeth on which he is not working during the retipping process submerged in water to prevent loss of temper. Williams retipped bits which have been worn through use to an extent that the original teeth have served their useful life.

Where a patented device of long life has among its integrated elements a part which, as a result of use of the device, quickly wears out and, therefore, is temporary in duration, and the patentee licenses the use of the device, it will be presumed that the patentee and the licensee contemplated and intended that such temporary part would be replaced by the licensee and that replacing it would constitute permissible repair and not reconstruction amounting to infringement of the patent. In Wilson v. Simpson, 9 How. 109, 13 L.Ed. 66, the patent involved was on a woodworking machine. Included as elements of the claims were wheels carrying detachable knives. The operative life of the machine was several years, but the machine could not be continued in use without successive replacements of the detachable knives every 30 to 60 days. The court held that a temporary part wearing out in a machine may be replaced to preserve the machine, in accordance with the implied intention of the vendor, and that such a replacement does not amount to a reconstruction of the machine.[3]

3. In the opinion the court said: "The right of the assignee to replace the cutter-knives is not because they are of perishable materials, but because the inventor of the machine has so arranged them as a part of its combination, that the machine could not be continued in use without a succession of knives at short intervals. Unless they were replaced, the invention would have been but of little use to the inventor or to others. The other constituent parts of this invention, though liable to be worn out, are not made with reference to any use of them which will require them to be replaced. * * * But if another

In Heyer v. Duplicator Mfg. Co., 263 U. S. 100, 44 S.Ct. 31, 68 L.Ed. 189, the court following the principle announced in Wilson v. Simpson, supra, held that the sale by the patentee of a costly and durable copying machine, which depended for its operation on bands of gelatine attached to spools, which cost little and were quickly used up, implied a right in the purchaser to replace such bands as they wore out, without further consent of the patentee.

The principle was again applied in Landis Machinery Co. v. Chaso Tool Co., 6 Cir., 141 F.2d 800. There, the patent covered die heads for cutting threads in mass production. The patented machine utilized replaceable cutters, called chasers. The patented machine was long-lived; the cutters were expendable. The court held that the expendable cutters could be replaced by purchasers without infringing the patent.[4]

■ Here, it cannot be said that the teeth are expendable or constitute temporary parts. In the great majority of instances, the economic life of the original teeth and the economic life of the original bearings are approximately equal, so that when the teeth wear out, the usefulness of the entire bit is at an end. In a relatively small percentage of instances, the bearings have a longer life than the teeth and the teeth may be retipped and the useful life of the bit for drilling in soft formations extended. It cannot be said, we think, that the teeth are expendable, or that they constitute temporary parts of short life in a long-lived machine, nor that Hughes contemplated and intended that the lessees might replace worn-out teeth by retipping and devoting the bits to further use. Moreover, the provision of the lease that the lease should terminate and the right of the lessee to use the bit should cease at the end of the useful life of either the original teeth or the original bearing negatives any such intention on the part of Hughes.

And it should be noted that in Wilson v. Simpson, supra, the court, while holding the detachable knives could be replaced, said: "The other constituent parts of this invention, though liable to be worn out, are not made with reference to any use of them which will require them to be replaced. These, without having a definite duration, are contemplated by the inventor to last so long as the materials of which they are formed can hold together in use in such a combination. No replacement of them at intermediate intervals is meant or is necessary. * * * With such intentions, they are put into the structure. *So it is understood by a purchaser, and beyond the duration of them a purchaser of the machine has not a longer use.*" (Italics ours.)

It is true that Scott and Garfield is a combination patent for a device which embraces a head, three cutter shafts, cutters mounted on the shafts, and circumferential rows of teeth specifically formed and positioned; and that Fletcher is a combination patent for a device embracing a head, two frustoconical cutters mounted on the head, and concentric rows of teeth specifically arranged in their relation to each other. However, in Scott and Garfield the arrangement of the rows of teeth on each cutter in relation to the rows of teeth on the adjacent cutters, the size of the teeth, and the interfitting of the rows of teeth on each cutter with the rows of teeth on the adjacent cutters constitute, in the main, the novelty in the invention and produce the improved results. Likewise, in Fletcher, the uniform size, number in each row and specific arrangement of the teeth, in the main, constitute the novelty in the invention and produce the improved results. In these respects, we think the instant case is analogous to the case of Davis Electrical Works v. Edison Electric Light Co., 1 Cir., 60 F. 276, 278, 282, where a combination patent for an electric lamp was involved. The claim in suit read: "The combination of

---

constituent part of the combination is meant to be only temporary in the use of the whole, and to be frequently replaced, because it will not last as long as the other parts of the combination, its inventor cannot complain, if he sells the use of his machine, that the pur-

chaser uses it in the way the inventor meant it to be used, and in the only way in which the machine can be used."

4. See also Morgan Envelope Co. v. Albany Paper Co., 152 U.S. 425, 434–435, 14 S.Ct. 627, 38 L.Ed. 500.

carbon filaments with a receiver made entirely of glass, and conductors passing through the glass, and from which receiver the air is exhausted, for the purposes set forth."

The court held that the replacement of an attentuated carbon filament, one element in the combination, was reconstruction and not permissible repair, because all of the elements other than the filament were old, and the filament and its use in the relation described was the new element in the combination and produced the improved results.

The instant case is also analogous to Morrin v Robert White Engineering Works, 2 Cir., 143 F. 519, where a combination patent for a steam generator was involved. Tiers of generating tubes of specified form and shape constituted the vital element of the combination. The improvement over the prior art and the advantages resulting therefrom were found in the new tube. The court held that the replacement of sets of tubes in the patented device was not permissible repair, but was, in fact, furnishing a new boiler essentially reconstructed in all of its novel features, and constituted infringement.

■ Williams, by his process of retipping, undertakes to restore the worn-out teeth as nearly as possible to their original form, size, and position. He thus reconstructs and replaces that element of each patent wherein lies the novel features of the combination. We hold that so doing is not permissible repair, but reconstruction, constituting infringement. This conclusion finds support in Hughes Tool Co. v. Owen, 5 Cir., 123 F.2d 950, in Southwestern Tool Co. v. Hughes Tool Co., 10 Cir., 98 F.2d 42, 45, American Cotton Tie Co. v. Simmons, 106 U.S. 89, 1 S.Ct. 52, 27 L.Ed. 79, and Hughes Tool Co. v. United Machine Company, D.C.N.D.Tex., 35 F.Supp. 879.

We may concede, without so deciding, that retipping or replacement on a cutter of a defective or inefficient tooth, or a tooth destroyed by accident, would constitute permissible repair, rather than reconstruction. But that is not this case. Here, Williams takes the bits, the life of the original teeth of which has ended through use and wear, and restores all of such teeth to their original size, shape, and position.

■ The patent law confers on the patentee a limited monopoly. It operates to create and grant to the patentee an exclusive right to make, use and vend the particular device described and claimed in the patent. The extent of the right is limited by the definition of the invention and its boundaries are marked by the specifications and claims of the patent.[5]

■ In licensing the use of his patented device, the patentee may impose restrictions on the use thereof by the licensee, either as to time or space, or any other restriction upon the exercise of the granted privilege, save only, that he may not attach a condition to his license that will enlarge the monopoly granted him by his patent, and thus acquire a monopoly which the statutes and the patent did not give him.[6]

Had the lease agreements, instead of providing for their termination when the useful life of the original cutter teeth and/or bearing ended, provided they should terminate on specific dates, the use or repair of a bit leased under such an agreement after the expiration date stated therein would have constituted infringement.

■ The lease agreements provided that the right of the lessee to use the bits should terminate upon the occurrence of a future event, namely, the end of the useful life of the original teeth, an event which would occur in normal course as the result of the use of the bits. That provision imposed nothing more than a restriction as to time. When such event occurred the right of the lessee to use the bit ceased and with it his right to repair the bit, and the repair of

---

5. Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 456, 60 S.Ct. 618, 84 L.Ed. 852; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 491, 62 S. Ct. 402, 86 L.Ed. 363; Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 509, 510, 37 S.Ct. 416, 61 L.Ed. 871.

6. Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 456, 60 S.Ct. 618, 84 L.Ed. 852; American Lecithin Co. v. Warfield Co., 7 Cir., 105 F.2d 207, 212.

the bit thereafter constituted an infringement.

It is urged, however, that Hughes, by incorporating in each lease the provision that the lease shall terminate and the lessee-user shall return the bit, when either the original bearing or teeth have served their useful life, misuses its patent monopoly contrary to public policy, destroys the utility of the bits before they are completely worn out, and imposes forbidden restraints upon the right of retippers who carry on their business in competition with Hughes in its leasing of new bits.

 The reasons which motivated Hughes in leasing, rather than selling its bits, and in requiring the return thereof for inspection, testing and research are obviously to enable Hughes to improve the quality of its bits, to provide the proper bit for drilling in particular formations or in a particular area, to provide valuable information to drillers who use the Hughes bits, to maintain the high standard of its products and protect their reputation. Failures of retipped bits would tend to injure the reputation of Hughes' bits. The lease agreement and the practice of recovering used bits, as stated by the Fifth Circuit in Robertson Rock Bit Co. v. Hughes Tool Co., supra, is practical, reasonable and fair.

The challenged lease provision does not bring the instant case within the "Tie-in" cases. In Automatic Radio Manufacturing Company v. Hazeltine Research, 339 U.S. 827, 70 S.Ct. 894, the Supreme Court classified the "Tie-in" cases as cases involving schemes "requiring the purchase of unpatented goods for use with patented apparatus or processes, prohibiting production or sale of competing goods, and conditioning the granting of a license under one patent upon the acceptance of another and different license." In that case the court also said, "That which is condemned as against public policy by the 'Tie-in' cases is the extension of the monopoly of the patent to create another monopoly or restraint of competition—a restraint not countenanced by the patent grant." Here, the provision imposes a restriction on the use in point of time and a duty to surrender the bit when the right to use has ended. Beyond that it imposes no requirement, no prohibition and no condition on the lessee. It is not, in our judgment, within the principle of the "Tie-in" cases.

A patentee, in granting a license, may not require a licensee to purchase unpatented goods for use with the patented apparatus,[7] prohibit the use by the licensee of goods of a competitor,[8] condition the granting of the license upon the acceptance of another and different license,[9] control the resale prices of patented articles after he has sold them,[10] use his patent to protect an unpatented element from competition,[11] or otherwise enlarge the monopoly granted by the patent.[12] But here, as we have indicated, Hughes, by the lease agreements, merely imposes a limitation as to the time the bits may be used, a limitation clearly within the range of its patent monopoly, and it does so, not for ulterior purposes, but to carry out a practical, reasonable and fair business practice that will enable it to better serve its lessee, maintain a high standard of quality in its products and protect its business reputation.

We conclude that Hughes is not guilty of a misuse of its patents and has not violated the Clayton Act, 15 U.S.C.A. § 12

7. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 491, 62 S.Ct. 402, 86 L.Ed. 363; International Salt Co. v. U. S., 332 U.S. 392, 394–396, 68 S.Ct. 12, 92 L.Ed. 20.

8. United Shoe Machinery Corp. v. United States, 258 U.S. 451, 456, 457, 458, 463, 464, 42 S.Ct. 363, 66 L.Ed. 708.

9. United States v. Paramount Pictures, 334 U.S. 131, 156, 157, 68 S.Ct. 915, 92 L.Ed. 1260.

10. United States v. Univis Lens Co., 316 U.S. 241, 250, 62 S.Ct. 1088, 86 L.Ed.

1408; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 456, 457, 60 S.Ct. 618, 84 L.Ed. 852.

11. Mercoid Corporation v. Minneapolis-Honeywell Regulator Co., 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396; Mercoid Corporation v. Midcontinent Inv. Co., 320 U.S. 661, 665, 64 S.Ct. 268, 88 L. Ed. 376.

12. United States v. Masonite Corp., 316 U.S. 265, 277, 62 S.Ct. 1070, 86 L.Ed. 1461.

et seq., or unlawfully interfered with the business of Williams.

The Fletcher patent expired May 3, 1949, after the judgment below was entered.

The case is remanded, with instructions to terminate the injunction in so far as it enjoins further infringement of the Fletcher patent. In all other respects the judgment is

Affirmed.

HUXMAN, Circuit Judge (dissenting).

I would hold the Scott-Garfield patent invalid for want of invention. New combinations of old elements producing new results, prior art, ordinary skill, and flashes of genius are terms incapable of exact definition. They are terms readily applicable to most any given state of facts to produce most any desired result, or support any desired view. Whether a combination of old elements rises to the dignity of inventive genius producing new and extraordinary results generally depends upon the views of a judge learned in the law but possessed of ordinary engineering or mechanical learning, training, skill or ability. For myself, I fail to discern any spark let alone flash of genius in the arrangements of three conical grinding surfaces upon synchronized rotating axes.

Leading a stream of water from the radiator of an automobile to a miniature radiator equipped with a fan in the body of a car, certainly led to startling and revolutionary results in the heating of automobiles. At once out of the window went heated bricks, hot water bottles, and all other heating pads. Hot water heaters were universally accepted and yet without exception we have held that the perfection of a hot water heater in an automobile did not involve a flash of genius—only mechanical skill—and therefore the device was not patentable.

The arrangement of three revolving or moving elements upon synchronized axes or pivotal devices is old in the field of mechanics. The principle is employed in many ways. I fail to see any flash of genius in the arrangement of three conical shaped grinding surfaces with intermeshed teeth rotating in unison upon a drilling stem. Such an arrangement, at best, is but an extension of the same idea embodied in a patent involving two such surfaces and at most requires the application of ordinary mechanical skill.

I am of the further view that in any event the retipping operations constitute permissible repair and not reconstruction. The principal case dealing with this subject is the old case of Wilson v. Simpson, 9 How. 108. This case is a good illustration that we seem to find what we look for in the field of patent law. Like Chief Judge Phillips, I place strong reliance for my views upon this case. In the opinion, in speaking of repairs and giving examples of repairs, the Supreme court says: "In either case, repairing partial injuries, whether they occur from accident or from wear and tear, is only refitting a machine for use. And it is no more than that, though it shall be a replacement of an essential part of a combination. It is the use of the whole of that which a purchaser buys, when the patentee sells to him a machine; and when he repairs the damage which may be done to it, it is no more than the exercise of that right of care which everyone may use to give duration to that which he owns or has a right to use as a whole."

And again the court says: "It would be the right of a purchaser to repair such a thing as that, so as to give it what was its first shape, if it had been turned from it, or, by filing, grinding, or cutting to keep it up to the performance of its original use. But if, as a whole, it should happen to be broken, so that its parts could not be readjusted, or so much worn out as to be useless, then a purchaser cannot make or replace it by another, but he must buy a new one."

As I understand, neither the Fletcher nor the Scott-Garfield patents covered the length, thickness or shape of the teeth. The Fletcher patent covered intermeshing teeth on two synchro-conical grinding surfaces. The Scott-Garfield patent covered the additional element of three such conical surfaces instead of two.

It is clear from the record that appellant's retipping operations are performed on bits whose teeth still intermesh and at a time when the bits have continuing usability, and that the lessee, as possessor thereof, asserts the continuing right to their further use and releases them only temporarily for the restoration of the teeth to their original size.

Since the teeth still have left some of the original economic use when they are repaired, retipping does not create new teeth or new economic life. It merely extends the economic use of the original teeth beyond a point of time where it would have expired, save for the retipping.

Paraphrasing the language of the Supreme Court in the Wilson case, supra, "A lessee of the Hughes' bit had the right to the use of the bit until the original teeth and/or bearings were worn out, and when he repaired the damage to the teeth, he did no more than exercise that right of care which everyone may use to give duration to that which he owns or has a right to use as a whole."

Neither do I see anything in the leasing agreement which prohibits retipping. Since it is an agreement relating to a patented article, it will be carefully scrutinized to make sure that it does not extend the patent monopoly. It is worthy of note that the agreement does not mention retipping or repair. If retipping is held to constitute repair, an agreement prohibiting it would be void because it would extend the patent monopoly. The asserted reason for the agreement is to enable appellee to repossess worn out bits for laboratory experiments and tests. It is conceded that only a small percent of the recovered bits are so analyzed and that the remainder are junked. So it is also without dispute that only a small percent of the bits are capable of being retipped. Permitting retipping of this small number of bits would in no wise interfere with any analytical operations appellee might wish to conduct.

I would hold the Scott-Garfield patent invalid and that the lease agreement does not prohibit retipping.

MURRAH, Circuit Judge (concurring in part and dissenting in part).

Within the narrow limits which I shall undertake to delineate, I agree with the majority that the Scott and Garfield Patent is valid, but I agree with Judge Huxman that the retipping operation infringes nothing that is patentable or patented. Because one can infringe only that which is patentable and protected, it seems important to define the scope of the invention in the light of the highly crowded and adjudicated prior art.

Patent No. 1,480,014, issued to Scott in 1924, was directed to conical-shaped cutters with interfitting teeth. The object of the invention, so we have said, was to provide a plurality of cutters, so shaped and mounted as to cooperate to clear each other of material, which would otherwise tend to adhere thereto and clog the cutting action of the bit. The embodiment of the invention illustrated in the patent drawings employed two cutters, although the patent was not limited in this respect and the more common practice of the day was to employ three cutters. Williams Iron Works Co. v. Hughes Tool Co., 10 Cir., 109 F.2d 500, 502.

Patent No. 1,647,753, issued to Scott and Wellensiek in 1927, was directed to long, narrow chisel-shaped penetrating teeth, arranged in circumferential rows around the cones, with their adjacent sides substantially parallel, spaced apart to provide clearance. Considering the two patents in their patentable relationship to each other, we limited the Scott Patent to a structure having interfitting teeth, and sustained the Scott and Wellensiek Patent on the size and shape of the teeth as arranged in circumferential rows around the cone to interfit. See Chicago Pneumatic Tool Co. v. Hughes Tool Co., 10 Cir., 97 F.2d 945. In this state of the art, we held that the restoration of the worn teeth and the furnishing of new bushings and retaining rings in the bearings of bits which had been sold for junk amounted to a furnishing of "parts which are specifically covered by the patents". We held that this operation was "well outside the domain of permissible

repair and restoration, and plainly constitutes infringement." Southwestern Tool Co. v. Hughes Tool Co., 10 Cir., 98 F.2d 42, 45. See also Hughes Tool Co. v. United Machine Co., D.C., 35 F.Supp. 879.

The Fletcher Patent in suit, No. 1,856,-627, issued May 3, 1932, and now expired, also related to the roller cutters on the rotary drills, and was particularly directed to the relative size and location of the teeth on the cutters. It described the arrangement of the teeth in circumferential rows around the cutters, staggered longitudinally of the cutters so that the teeth were longitudinally out of alignment with the teeth in the rows adjacent thereto. Each row of teeth had a lesser number of teeth than the outer adjacent row. The teeth were chisel-shaped, approximately uniform in size and pitch, except that the outer row might be slightly longer than the others. We accorded patentability to this particular interfitting arrangement of the teeth as a combination of old elements, whereby a new and useful result was obtained, or whereby an old result was obtained in a more facile, economical and efficient way. Williams Iron Works Co. v. Hughes Tool Co., 109 F.2d 500, 506.

In Hughes Tool Co. v. Owen, 5 Cir., 123 F.2d 950, 953, it was claimed that the retipping of the teeth infringed both the Scott and Wellensiek and the Fletcher Patents. The trial court took the view that the retipping was only a permissible repair. The appellate court, however, sustained Hughes' contention that "the teeth themselves, in their relation to each other, are the entire patented device, and it is impossible to rebuild them without reconstructing the patent as a whole".

Since all of these patents have now expired, their teachings belong to the public, and Hughes can no longer claim protection against the practice of their disclosures.

Scott and Garfield Patent No. 1,983,316, the patent in suit and a late comer in the art, also relates to the interfitting arrangement of the teeth on the cutters of three-cone rotary drill bits. Like its forerunners, the teeth are so arranged to interfit to clean each other without tracking at the bottom of the hole. This patent was sustained in Robertson Bit Co. v. Hughes Tool Co., 5 Cir., 176 F.2d 783, 789, as the first successful "interfitting workable three cone bit". The popular acceptance of this bit in the trade attested to its advancement of the art, and its patentability was sustained primarily because of its preference over the prior art. The device is undoubtedly new and useful to the industry in its hazardous search for oil and gas at constantly increasing depths below the surface. The record shows this bit drills approximately one-third more hole in two-thirds of the time required by two-cone bits, and hence conserves much valuable time consumed in pulling the pipe out of the hole to change the bits. It is the product of constant and intensive research in the art. In the face of the considered rulings of the Patent Office, the judgment of the Fifth Circuit, and its almost universal acceptance as a distinct advancement in the art, I am unable to say that it does not involve invention.

But, at most, it is a new combination of old elements to improve a preexisting combination, and we should be at pains not to extend its scope beyond that which is actually invented. Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 10, 67 S.Ct. 6, 91 L.Ed. 3. The only possible claim for novelty or to a "substantial innovation" in the prior art is the interfitting arrangement of the three-cone over the interfitting arrangement of the two-cone bit as disclosed in Scott, Scott and Wellensiek and Fletcher. And, the importance of this innovation must be discounted in the light of what we said in Williams Iron Works Co. v. Hughes Tool Co., supra, in describing the plurality of cutters disclosed in Scott. Certainly it can no longer lay claim to protection for the size and shape of the teeth as it did in Southwestern Tool Co. v. Hughes Tool Co., supra.

The majority holds that by the restoration of the worn teeth to their "original form, size and position", Williams "reconstructs and replaces that element of each patent wherein lies the novel features

of the combination", and that such operation constitutes infringing reconstruction. To so hold is to accord Scott and Garfield a monopoly on the size and shape of the teeth on the bit as a patentable element of the invention. And, to so hold, in my judgment, extends the scope of the invention beyond anything that is claimed in the patent or on this record. Indeed, Hughes makes no claim in this court to protection of the size and shape of the teeth, or for that matter, that their reproduction as such constitutes infringement. It is only when the teeth become worn to the extent that they no longer perform the patentable function of interfitting with each other that Hughes claims protection against restoration to their original size and shape. It is said that the bit is constructed as a unit to wear together, and when the original teeth or bearings have served their useful life, the bit is no longer useable.

The majority treats the retipping operation as if it were performed on teeth which no longer perform their interfitting function. If I could agree to this premise, I should have no difficulty agreeing that the restoration of the teeth by retipping constitutes an infringing reconstruction. But the record shows without dispute that in some instances, depending upon the formation encountered, the bearings in the bits become worn and unsafe, while the teeth on the bits are yet capable of further service, while in other instances, the teeth become worn and lose their penetrative effectiveness, while the bearings and other parts are yet capable of useful service. It is these latter bits which are carefully selected for retipping. Moreover, if as suggested, all parts are intended to wear together, it seems unlikely that the original bearings would outlast the teeth to the extent that their restoration would amount to an infringing reconstruction.

In our case, unlike Southwestern Tool Co. v. Hughes Tool Co., supra, the bits involved have not been discarded for junk, the customer claiming no further right to use them. Instead, they have asserted continued useability and a further right to their use, releasing them only temporarily for the restoration of a constituent but nonpatentable part. Believing as I do that the only patentable element of the device lies in the novelty of the three-cone interfitting arrangement of the teeth on the bits, I cannot believe that the reshaping of the teeth on the cutters after the bits have lost their penetrative effectiveness, is any more than the prolonging of the useful life of that for which the customer has bargained. Otherwise stated, it is "no more than the exercise of that right of care which everyone may use to give duration to that which he owns or has a right to use as a whole." Wilson v. Simpson, 9 How. 109, 50 U.S. 109, 13 L.Ed. 66. In the words of Mr. Justice Holmes, it is "the construction of a bargain on principles of common sense applied to specific facts."

This brings us to the validity of the leasing contract. If I could agree with the majority that the retipping operation constituted an infringement, I should have no difficulty agreeing to the validity of the contract, for it would do no more than prevent infringement. Indeed, it becomes superfluous, for the patent itself affords its own measure of protection. But Hughes takes the position that the lease is valid to prevent retipping whether it be construed as repair or reconstruction. It contends in effect that it has the contractual right to limit the right of the use of its product as to time and space, and that it may therefore legitimately say when and on what conditions it shall be let for use. By Williams we are urged to construe the language of the lease contract as specifying the surrender of the bits upon contingencies indicating a passing of title as well as possession. Our attention is called to the fact that Hughes treats the invoices of the bits on its books as a sale for inventory and tax purposes, and that the reclaimed bits are eventually sold for junk. But, I do not believe that this contract should be so captiously construed.

Even though the contract be said to be a contract for the useful life of the bits, Williams strenuously denies that by its terms or legal effect it does preclude retipping as a noninfringing repair. The argument is to the effect that the purpose of the agreement is to let the bit to the

lessees for its full and complete economic life, and that the right to demand its return does not accrue until its economic usefulness has been exhausted; that the lessee is therefore free to perform any needful repair to prolong his bargain.

While denying that the prevention of retipping is the primary object of the leasing agreement, Hughes contends that it has the legal effect of doing so. It takes the position that when either the original teeth or bearings have served their useful life, the bit is no longer safe for drilling operations, and in the interest of safety and efficiency, the bit should not be used again. It would justify the restriction as an appropriate means of retaining exclusive control of its product for experimental and development purposes, and for the protection of its integrity and reputation.

If the parties intended that the lessee should have the full economic benefits of the bit, the lease is susceptible of Williams' construction, and I could agree with Judge Huxman's conclusions in that respect. But I do not believe that such are the terms or legal effect of the contract. In the first place, the contract plainly obligates the lessee to surrender the bit, upon request, when the original cutter teeth and/or bearings have served their useful life, not when both contingencies have accrued, as Williams suggests. To me, this language clearly indicates that the lease was intended to let something less than the full economic life of the bit. My determination that retipping constitutes noninfringing repair is necessarily based upon the postulate that the economic life of the bit has not been completely exhausted when it is retipped.

When, therefore, the contract is fairly construed within its four corners in the light of its purposes and the conduct of the parties, it has, in my judgment, the legal effect of preventing retipping of original teeth after they have served their useful life. In other words, the contract has the effect of prohibiting that which the patent does not. I haven't any doubt of the right of Hughes to lease its patented bits on terms reasonably appropriate to the effectuation of its business policies. Lease contracts for the use of machinery, patented or unpatented, are not unusual in industry. Nor should they be suspect unless they may be said to be "disguised restraints of free competition". International Salt Co. v. United States, 322 U.S. 392, 398, 68 S.Ct. 12, 16, 92 L.Ed. 20.

But, since the contract lies outside of the patent monopoly, it can claim no immunity from laws prohibiting contracts which unreasonably restrain interstate trade or commerce, or which tend to create monopolies. United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701; United States v. U. S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746.

Undoubtedly, the leasing arrangement, when construed to prevent retipping, will have the effect of restraining interstate trade and commerce in the bits to the extent at least that the retipped bits are excluded from the market. And, competition in the bits will thus be lessened to the same extent. But not all contracts in restraint of trade are prohibited by Sections 1 and 2 of the Sherman Act, 26 Stat. 209, 15 U.S.C.A. § 1. Since Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, and United States v. American Tobacco Co., 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663, only those contracts which unreasonably restrain trade as defined at common law are forbidden by the Sherman Act. Dr. Miles Medical Co. v. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502; United States v. Gypsum Co., supra, 333 U.S. at page 400, 68, S.Ct. 525; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416. Nor can I say on this record or in this posture of the case that the contract is unreasonable per se. We are not dealing with a price-fixing combination as in Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. Line Material Co., supra; United States v. U. S. Gypsum Co., supra; and Mandeville Farms v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328; nor a conspiracy to monopolize as in United States v. American Tobacco Co., supra.

Section 3 of the Clayton Act, 38 Stat. 730, 15 U.S.C.A. § 14, proscribes all contracts for the sale or lease of machinery, patented or unpatented, on condition that the lessee will not purchase or use the machinery of a competitor of the lessor, where the effect of such contract or understanding is to substantially lessen competition, or tends to create a monopoly in any line of commerce. And such contracts are unreasonable per se. Fashion Originators Guild v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949; International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20. Cf. Standard Oil Co. v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371.

But this Section of the Clayton Act was intended to prohibit specific practices of a seller or lessor affecting his competitor or competitors, and I am unable to say that the noninfringing repairmen are competitors within the meaning and prohibition of Section 3 of the Clayton Act. Certainly they are not competitors in the sense that they make, vend, use or lease the same article of trade, otherwise they would be infringers. They compete only by prolonging the life of the article. But even though they be called competitors within the meaning of the Act, I cannot say on this record and in this posture of the case whether the effect of the retipping operations is to substantially lessen competition or create a monopoly, i.e. Standard Oil Co. v. United States, supra.

The trial court sustained the lease as an "established practice in the industry", and concluded that neither the original lessee nor anyone else had the right to retip or rebuild the teeth without consent of the lessor. The leasing method was also approved as "practical, reasonable, and completely fair" in Robertson Rock Bit Co. v. Hughes Tool Co., 5 Cir., 176 F.2d 783, 785 But in both instances the judgment was based upon the postulate that retipping activities amounted to an infringement, and that the leasing agreement was therefore effectual to prevent it. In neither case did the court judge the contract as a restraint upon a noninfringing operation. In the

view the trial court took of our case, it had no occasion to consider the impact of the antitrust laws on the contract insofar as it prohibited noninfringing retipping. I think that question involves both law and fact which should be decided in the first instance by the trial court.

I would hold the patent valid but noninfringed by the retipping operation; that the contract is a lease, having the legal effect of precluding retipping operations, the validity of which must be judged without reference to the patent or patent law. I would leave the question whether the contract can be squared with the antitrust laws to the consideration and decision of the trial court in the first instance.