**HUGHES TOOL CO. v. COLE.**

**Civ. A. No. 4370.**

United States District Court
W. D. Oklahoma.

July 1, 1953.

George I. Haight, Edward A. Haight, Chicago, Ill., Robert F. Campbell, Ray L. Smith, Houston, Tex., and Lynn Adams, Oklahoma City, Okl., for plaintiff.

Robert F. Davis, Stevens, Davis, Miller and Mosher, Washington, D. C., and Charles M. McKnight, Tulsa, Okla., for defendant.

VAUGHT, Chief Judge.

In this action the plaintiff seeks to enjoin the defendant from infringing certain patents, interfering with certain lease contracts, and from trespassing. The complaint charged the defendant in Count I with infringement of its patents Numbers 1,856,627 and 1,983,316, and by subsequent amendment, at the suggestion of the defendant, the infringement of its patent No. 2,333,746. Since the filing of the complaint,

patents Numbers 1,856,627 and 1,983,316 have expired and we are concerned only with patent No. 2,333,746.

The complaint consists of three counts. The first alleges that the patent is being infringed by the defendant by procuring rotary drill bits covered by the patent, manufactured and leased by the plaintiff to oil well drillers, welding new metal onto the worn cutter shells of the bits and building new teeth thereon, and that such acts of the defendant constitute reconstruction and rebuilding of the cutters and bits. It further alleges that the bits are leased to the users thereof and are not sold, the title remaining at all times in the plaintiff. That such worn-out bits as the defendant procures and so reconstructs are sold by him without plaintiff's knowledge or consent.

The second count, in brief, alleges that plaintiff leases said bits to the users thereof under an arrangement which is recorded on the delivery tickets and which is hereinafter set out.

The third count alleges that the defendant, with full knowledge of the provisions of the lease agreement, by wrongfully taking possession of said bits, accepting the surrender thereof from the lessees and inducing the lessees to surrender the bits to them, has participated in breaches of the lease agreement, abetted and encouraged said lessees to breach their lease, and deprived the plaintiff of its rights under said lease agreement, and prays that the defendant be permanently enjoined.

The defendant filed an answer and counterclaim. He admits many of the acts complained of by plaintiff, but denies that in so doing he in any manner infringes the plaintiff's patent. He admits that plaintiff has been engaged for a long time in manufacturing rotary drill bits and that it distributes the bits under the lease agreement, but urges that the agreement is but a subterfuge to obtain and maintain a monopoly upon the market for roller bits including secondhand bits, in violation of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209, as amended, entitled "An act to protect trade and commerce against unlawful restraints and monopolies", commonly known as the Sherman Act, and particularly sec-

tions 1 and 2, 15 U.S.C.A. §§ 1–2. He further admits that his acts have been without the consent of the plaintiff but denies that he performed any retipping on bits that were "worn-out."

In answer to Count II defendant admits that each of the bits distributed by plaintiff has been marked as the property of the plaintiff, and admits knowledge of the lease agreement.

In answer to Count III defendant urges that the lease agreement is but a subterfuge to monopolize the drill bit industry in violation of the Sherman Act.

The counterclaim is voluminous and alleges in effect violation of the Sherman Act, contending that the acts of plaintiff, in the distribution of its bits and the conduct of its business, constitute a deliberate plan to monopolize and control the roller cutter drill bit industry. Defendant further contends that the lease contract with the users of plaintiff's bits was made in furtherance of its intent to dominate, control and monopolize said industry, setting out fifteen allegations of acts upon which he bases his contentions. He further contends that his business has been damaged and prays for an injunction and for damages.

Plaintiff replied to the amended counterclaim, denying in effect all the allegations thereof, except that it admits that in the latter part of 1931 or early in 1932, it began its lease system in the distribution of its bits and in recovering all bits so leased for the purposes set forth in its pleadings.

The evidence introduced consisted of oral testimony, depositions and records of testimony in former cases, introduced by agreement of counsel, testimony given in discovery depositions, together with a large number of exhibits. The evidence has been carefully considered by the court, together with the briefs.

■ This case is one of a series, involving the same character of testimony, that have been tried and determined in this Court, the Court of Appeals and Federal Courts in other jurisdictions, which raised practically the same issues of both law and fact. However, in the instant case the evidence offered by the defendant, while of

the same character as offered in other cases, covers the field more thoroughly and in greater detail. For that reason we deem it advisable to go into the history of the field of endeavor out of which the issues involved here have developed. The cause of action here grows out of activities in the development of the production in various oil and gas fields over the past thirty or forty years. It is common knowledge that in the various activities in a newly-discovered oil and gas field, the keenest competition develops. The lure of quickly-acquired riches attracts thousands of people. First are the investors who desire to acquire, as quickly as possible, interests in real estate in the vicinity of the discovery well. At once there is a great influx of real estate brokers, oil and gas lease brokers and individual investors, all competing for such interests. Next the drillers of oil and gas wells appear. Those who own or acquire interests in the real estate want production as rapidly as it can be accomplished, and the great race is on to tap the sources of supply. They want the most skilled and the fastest drillers they can secure; those with the best organizations, tools and equipment. In the development of the various fields, drillers encounter various strata of earth formation, which requires drilling bits that will accomplish the desired results. Hard formations require certain types and character of bits to drill the hole rapidly. This situation has challenged the ingenuity of the inventor, the scientific learning and ability of the engineer, and the skill of the factory organization capable of manufacturing the devices known as drilling bits. The constant demand of the driller for faster drilling bits has inspired the inventor and the engineer to produce the best character of bit, and to continually observe the service it performs and improve its performance. This has resulted in the United States Patent Office being flooded with various inventions in the art. Many patents have been issued on such inventions, and a great deal of litigation has ensued for infringement, resulting in the courts declaring some of such patents invalid and sustaining others. Most of the litigation has been brought about by keen competition in the manufacture, sale, distribution and use of the bits, and claimed infringement of patents of the articles or devices covered by them. The evidence discloses that the bit which is of greatest interest to the driller is the bit used in drilling hard rock formations (hereinafter referred to as the "hard rock bit."). The keenest competition in design, material, manufacture and distribution exists in these hard rock bits. At the time this action was instituted a number of firms designed, manufactured, sold, leased and distributed a roller cutter bit under patented devices. Among them were the plaintiff, Reed Roller Bit Company, Chicago Pneumatic Tool Company, Globe Oil Tools Company, H. C. Smith Oil Tool Company, Security Engineering Company, Inc., and lesser firms, the plaintiff having the largest organization and furnishing the greatest output of the product.

Plaintiff has for many years manufactured and distributed hard rock bits, under various patents which emanated from and were developed within its own organization through its research department, and were not obtained from outside competitive individuals or organizations, among which were patents Numbers 1,856,627, 1,983,316 and 2,333,746. The validity of No. 2,333,-746 has been challenged here. These bits are designed and manufactured for the purpose of drilling hard rock formations and are known among the users as three cone bits for rotary drilling. Without attempting to describe them technically, so far as the issues here are involved, it is sufficient to say they are what is termed an integral device, that is, they consist, as assembled, of one solid or integral unit. There are two elements in the tool, the bearings that have to do with the rotary motion of the drill and the teeth that come directly in contact with the hard formation that is drilled. Upon the life of these two elements depends the usefulness of the device. When either element is worn out the device is of no further use unless it can be repaired. The tool is designed in such a manner that the two elements should be worn out at practically the same time, but sometimes this does not occur. Many times the teeth are

worn down to the cutter cone before the bearings are worn out. It is this latter situation that has given rise to the difficulties encountered here. When the teeth of the bit are so worn that its usefulness in drilling is gone, but the bearings are still in a usable condition, it is possible to weld metal onto the stubs of the teeth and restore them to their original shape and then use the bit for further drilling. This operation is known as retipping. This situation has given rise to an activity upon the part of welders to procure these bits for retipping. The bits are procured in various ways—from the lessees or their agents, picked up from where they are dumped at the drilling rigs, or arbitrarily taken from the stockpile at the rigs without plaintiff's consent. After the bits are retipped, either a charge for the service is made to the lessee or they are sold to the trade in the field. The defendant is one of those engaged in retipping activities.

In the earlier days of oil and gas drilling activities, bits were sold outright to the driller, and some of the manufacturers continue that practice. As the fields developed and competition in the industry grew, each manufacturer of bits became more and more interested in how his bits were performing. They employed competent field men to observe the performance of their bits and competent engineers to inspect the bits that had been used in the field, in order to discover any failure of performance and to devise ways of improving the product.

In order to do that more effectively, sometime in 1932 the plaintiff put in operation a system of leasing the bits instead of selling them, in order to secure all used bits for scientific examination for the purpose of improving its product in a highly competitive endeavor. The drillers placed the used bits aside near the rig and the plaintiff's field men would inspect them, and such ones as they deemed of special interest would be sent into the factory at Houston, Texas, for scientific research by competent engineers. Out of that scientific examination and research the bits were improved from time to time—new devices invented and new patents obtained. The residue of the drilled

bits subsequently would be gathered up by plaintiff and salvaged by smelting. The recovered metal was then either used or sold by the plaintiff. Considerable effort was put forth by plaintiff to gather up the used, dull bits, but its efforts were at times interfered with or retarded by the retipping activities of others.

The method of distributing the bits by the plaintiff under its lease agreement was to accompany the delivery of bits to the driller with a ticket which bore the legend:

"Hughes roller rock bits and all core bit heads are never sold but are leased. When the original cutter teeth and/or bearing have served their useful life, the user will surrender the bits to Hughes Tool Company upon request. In accepting delivery, the user agrees not to surrender any of the tools as mentioned above to other than a duly authorized representative of the Hughes Tool Company."

It will be noted that the terms of the lease are definite and the use of the device is for an indefinite period. The lease is simple and uncomplicated. The term is for the duration of the useful life of the device, which the evidence discloses may be for as short a time as a few hours, dependent only upon the conditions encountered in the drilling formations. The use of the device, under lease, is controlled entirely by the lessee, and the price is in no way dependent upon the amount or character of work performed by the device, but the lease merely provides for the return of the residue of the device as a drilling bit, upon demand. The lease contract is open to all users of hard rock bits, and no distinction is made in the rental price to any user.

Each of the bits delivered had stamped in the bit a serial number and the legend: "Property of the Hughes Tool Company," which was easily discernible by anyone handling or observing the bit. The evidence discloses that scattered among bits distributed by the plaintiff were experimental bits which were to be used in certain character of drilling, the recovery of which was important to the plaintiff for scientific study by its engineers. There were no special identification marks on the experimen-

tal bits, and the fact that they were experimental was known only to the plaintiff.

The defendant attacks the lease agreement and method of distribution of the bits by plaintiff, contending that it is not a good-faith arrangement but has been designed and carried out as a subterfuge to monopolize and control the hard rock bit industry and violate the Sherman Anti-Trust Act.

█ The defendant further contends that the fact the plaintiff distributes by far the largest percentage of the hard rock bits used in the oil industry, of itself is sufficient to establish a monopoly in the industry, and cites many authorities in an effort to sustain that contention. After reading those authorities and analyzing the respective factual situations and attempting to apply the law stated therein to the factual situation in the instant case, in my opinion they are not in point. Our attention has been called to United States v. United Shoe Machinery Corporation, D.C., 110 F. Supp. 295. The factual situations in the two cases are easily distinguished. In the instant case, the overwhelming demand for the hard rock bits manufactured by plaintiff, as disclosed by the evidence, has been the controlling factor in the success of the bits. Every user of hard rock bits who testified expressed his preference for the bits upon their merit. There is no doubt that the position obtained by plaintiff in the competitive field must be attributed to the merit of the hard rock bits manufactured and distributed by it. In the United Shoe Machinery Corporation case, supra, in discussing the legal principle involved, the court said, 110 F.Supp. at page 342:

"Indeed the way in which Mr. Justice Douglas used the terms 'monopoly power' and 'effective market control', [United States v. Griffith] 334 U.S. 100, 107, lines 2 and 6, 68 S.Ct. 941, at page 945, [92 L.Ed. 1236] and cited Aluminum [United States v. Aluminum Co. of America] suggests that he endorses a third and broader approach, which originated with Judge Hand. It will be recalled that Judge Hand said that one who has acquired an overwhelming share of the market 'monopolizes' whenever he does business, 148 F.2d [416], at page 428, column 1, apparently even if there is no showing that his business involves any exclusionary practice. *But, it will also be recalled* that this doctrine is softened by Judge Hand's suggestion that the defendant may escape statutory liability if it bears the burden of proving that *it owes its monopoly solely to superior skill, superior products*, natural advantages, (including accessibility to raw materials or markets), *economic or technological efficiency*, (including scientific research), low margins of profit maintained permanently and without discrimination, or licenses conferred by, and used within, the limits of law, (*including patents on one's own inventions*, or franchises granted directly to the enterprise by a public authority)." (Emphasis supplied.)

Under the factual situation in the instant case, it is my opinion that the plaintiff comes clearly within the exception.

A great deal of the evidence upon the part of the defendant is directed to the proof of such contention. Considerable testimony has been introduced as to facts and circumstances surrounding the origin and purpose of that lease agreement, which has been well summed up by the witness General Kuldell as referred to when Thomas M. Mobley was testifying as follows (R. 431–434):

"Q. I want to read you two questions and answers from the testimony of General Kuldell which was taken in the Chicago Pneumatic Tool Case and is now a part of this record. * * 'Q. I know it was many years ago, but do you recall the time when the sales organization or the field service organization changed? That was during the time you were there, I think. A. Yes, that's right. Q. Do you recall the reasons for changing or expanding the field organization and leasing rather than selling? A. It became a buyers' Market instead of a sellers' market and we couldn't sell the standardized bit which we had been making and selling through supply stores. The field test

then became more of an engineer's instead of a sales test to analyze the driller's problem and try to furnish him the most effective tool for his problem. And the whole business, the whole character of business, changed from one of standardized manufacture to one of seeking to manufacture not the most but at least the limited types of bits that would meet the limited field conditions. And to do that we sent many more men and men with much better technical training into the field, and they delivered the bits to the rig and watched them and got the results and reported back. Mostly sending the worn bits back to the laboratory for analysis. And that's how we came on this steel. The bearings wouldn't hold up; so better and better and better steels were developed until they held up better, and the teeth were changed and the spacing was arranged differently. All that information came from the field organization which were now the technical men who took the trouble to go to the rig and deliver the bits and watch them and bring them back. So the bits were no longer sold as a standardized product. They were what we call now a tailor-made product, made for the formation in the field.' Do you agree with that testimony? A. Well, most of the information that I had concerning those times came from the Colonel, and he is the man that knew."

This lease agreement under which plaintiff distributes its bits, which has been in force since 1932 *long before any retipping was practiced or even contemplated*, has been under attack in many cases and has been held valid. Robertson Rock Bit Company, Inc., v. Hughes Tool Company, 5 Cir., 176 F.2d 783, 785:

"As to the leasing agreements and the practices of recovering used bits under them, the district court properly held them valid."

In Williams v. Hughes Tool Company, 10 Cir., 186 F.2d 278, 279, 281, certiorari denied 341 U.S. 903, 71 S.Ct. 612, 95 L.Ed. 1342, in holding the lease agreement valid, the court said:

"Moreover, the decision of the Fifth Circuit in Robertson Rock Bit Co. v. Hughes Tool Co., supra, was rendered upon facts substantially identical with those presented on this record, and that decision, while not binding on this court, is strongly persuasive under the doctrine of comity."

And again in Williams v. Hughes Tool Company, 10 Cir., 199 F.2d 862, 864, the lease agreement is held to be valid. *In fact this court is of the opinion that every question raised in the case at bar and in the case last above cited has been determined by the latter opinion and is decisive here.* Quoting from Judge Murrah who concurred specially:

"In the former case, it was my view that the unexpired patents were valid but uninfringed; that separate and apart from the patent monopoly, the leasing agreement had the legal effect of prohibiting retipping of the Hughes bits. The question remained, in my mind, whether the agreement, when considered outside the patent monopoly and construed to prevent retipping, could be squared with the anti-trust laws. Being of the view that this question was open and undecided in the trial court, I thought the case should be remanded for the determination of that issue in the first instance.

"I interpreted the majority opinion in the former case to sustain the validity of the leasing agreement as a condition upon the right of use of the patented bits. Thus construed, it was my view that the injunction was limited to the protection of the patent monopoly. *Now, however, my brethren construe the opinion to sustain the validity of the leasing agreement as a proper exercise of Hughes' property rights in its bits apart from the patent monopoly. The plain implication of this holding is to remove any question of the validity of the leasing agreement under the anti-trust laws, and it forecloses the question which I had thought was at large in the lawsuit.* I must accede to the majority's interpretation of what it has written." (Emphasis supplied.)

This court having tried the Williams case, supra, in the first instance and being thoroughly acquainted with the evidence there submitted, which evidence has been introduced by stipulation in this cause, and having carefully considered all of the evidence introduced in the instant case, sees nothing new in the evidence here, insofar as infringement of the patents is concerned or as to the validity of the leasing agreement, from that of Williams v. Hughes Tool Company, supra, 186 F.2d 278. There it was held there was an infringement of patents Numbers 1,856,627 and 1,983,316 which, as stated above, have expired since the filing of the case at bar, and leaving here patent No. 2,333,746, only.

■ Without going into tedious detail suffice it to say that in view of the above holdings, the court is of the opinion that patent No. 2,333,746 is a valid patent and is being infringed by the defendant. However, the validity or invalidity of this patent is immaterial in determining the real issue in this case.

The defendant contends that he is engaged in a competitive activity in hard rock bits which he describes as secondhand bits, and that the plaintiff, in the manner of conducting its business in the manufacture and distribution of its hard rock bits, is unfair and tends to monopolize the competitive hard rock bit industry in violation of the Sherman Act.

Some of the companies which manufactured and distributed competitive bits of a similar character, sold their bits outright, parting with all title in them, and paid no attention to them thereafter. In such a situation, so long as any repairs or attempted repairs on such bits did not amount to reconstruction in such a manner as to infringe the patent on the article, the company could not complain. The evidence discloses that Reed Roller Bit Company and some others thus paid very little, if any, attention to what is known as retipping. The retipping was done by welders.

The plaintiff has no complaint against the retipping of bits of other manufacturers. It objects to the retipping of the Hughes bits because *they are the property of plaintiff*. It does not even appeal to reason to say that defendant can secure, often by questionable means, the property of plaintiff for retipping purposes and contend that it can use plaintiff's property *in competition* with plaintiff, and by so doing engage in a *legitimate competitive activity*.

■ That leaves two questions yet to be determined. First, do the lease agreement and the acts and conduct of the plaintiff in the distribution of its bits violate the Sherman Anti-Trust Act, by creating a monopoly in the sale and distribution of the bits, as alleged in the answer and counterclaim of the defendant? It is the opinion of the court that they do not. Such a contention has been foreclosed by the opinions in Williams v. Hughes Tool Company, supra, 186 F.2d 278, 285, and. 199 F.2d 862. In the earlier case it was contended that, there was a misuse of the patents which violated the Clayton Act, 15 U.S.C.A. § 12 et seq. In that case the court held:

> "We conclude that Hughes is not guilty of a misuse of its patents and has not violated the Clayton Act, 15 U.S.C.A. § 12 et seq. * * *"

In the Williams case, 199 F.2d 862, 864, quoting again from the concurring opinion:

> "Now, however, my brethren construe the opinion to sustain the validity of the leasing agreement as a proper exercise of Hughes' property rights in its bits apart from the patent monopoly. The plain implication of this holding is to remove any question of the validity of the leasing agreement under the anti-trust laws, and it forecloses the question which I had thought was at large in the lawsuit. I must accede to to the majority's interpretation of what it has written."

With this holding this court is not only in accord but feels that it is binding here.

The second question is: Apart from the patent monopoly, has the plaintiff the right to control by lease agreement the distribution of its bits for the purposes established by the proof? This question too has been determined adversely to the con-

tentions of the defendant. In the Williams case, supra, 186 F.2d 278, 285, the court said:

"The reasons which motivated Hughes in leasing, rather than selling its bits, and in requiring the return thereof for inspection, testing and research are obviously to enable Hughes to improve the quality of its bits, to provide the proper bit for drilling in particular formations or in a particular area, to provide valuable information to drillers who use the Hughes bits, to maintain the high standard of its products and protect their reputation. Failures of retipped bits would tend to injure the reputation of Hughes' bits. The lease agreement and the practice of recovering used bits, as stated by the Fifth Circuit in Robertson Rock Bit Co. v. Hughes Tool Co., supra, is practical, reasonable and fair."

And again in the Williams case at 199 F.2d 862, 863, the court said:

"Williams presents only one specification of points for reversal of the challenged order. Its substance is that since the patents have expired there is no justification for continuing the injunctions restraining Williams from interfering with the property rights of Hughes in its leased bits by retipping or rebuilding the teeth thereon. * * * It is admitted frankly in the brief of Williams that if these two features of the injunction had been completely separate and independent holdings, the expiration of the patents would not affect the feature relating to interference with the property rights of Hughes in its leased bits by retipping and rebuilding teeth thereon. *But the two features of the injunction were separate and independent.* The equitable right of Hughes to protection against infringement of its patents was quite separate and apart from its system of leasing its bits rather than selling them. Hughes was entitled to restrain infringement of its patents whether the bits had been leased or sold. And if the practice of Williams

in receiving from lessees bits manufactured by Hughes, retipping them, and building new teeth thereon, constituted systematic encouragement to lessees to breach valid and effective provisions in the leasing agreements, Hughes was entitled in equity to restrain such wrongful conduct without regard to whether the bits were manufactured under patents or not. *The two rights were separate and distinct.* Neither was dependent upon the other. Neither was an adjunct of the other. * * *" (Emphasis supplied.)

This reasoning is not only sound and logical, but is binding upon this court. The manufactured article, regardless of any patents, belonged to the plaintiff. In its method of distribution it could either lease or sell. It chose to lease its bits and recover them when their life of usefulness was over. Aside from the skill in the tool, it contained valuable material. The evidence discloses that aside from any patentable feature, when the bit was returned and put through the smelter, it had substantial value; that there was as much as $200,000 salvage value in one lot. But the defendant contends that the plaintiff permitted some of its customers at times to do the very thing he was doing to the bits. We fail to see any relevance in the testimony. This defendant was not a party to the lease agreement in any respect. He was an independent operator, doing what he did at his own risk. He has no complaint of merit about how the plaintiff carried out its lease contracts with its customers. Such conduct was no concern of his. Every time he handled one of these bits he had staring him in the face the legend thereon that it was the property of the Hughes Tool Company. The slightest inquiry would have disclosed the terms of the lease and he would have been informed that in accepting the delivery of the bits the lessee agreed "not to surrender any of the tools mentioned to other than a duly authorized representative of the Hughes Tool Company."

The defendant admits practically all of the acts alleged by the plaintiff and what

he has not admitted have been amply substantiated by the evidence. It is the opinion of the court that the defendant is infringing the plaintiff's patent No. 2,333,746 and should be enjoined from so doing. The plaintiff is entitled to an injunction against the defendant enjoining him from in any manner interfering with the leased property of the plaintiff.

Findings of fact, conclusions of law and a proper form of judgment in compliance with the views herein expressed may be submitted within thirty days from this date.